BRADFORD P. DAILEY v. INTEGON GENERAL INSURANCE CORPORATION, A NORTH CAROLINA CORPORATION

No. 843SC283

(Filed 2 July 1985)

1. **Damages § 11.1— refusal to settle insurance claim—punitive damages**

   Under some circumstances N.C. law permits the recovery of punitive damages on claims for a tortious, bad faith refusal to settle under an insurance policy even though the refusal to settle is also a breach of contract.

2. **Damages § 11.1— refusal to settle fire insurance claim—aggravated conduct— punitive damages—sufficient evidence**

   Plaintiff's evidence was sufficient to show a tortious refusal by defendant insurer in bad faith to settle plaintiff's fire insurance claim with accompanying aggravation so as to support an award of punitive damages where it tended to

show: defendant insurer waited two and one-half months after the fire that substantially destroyed plaintiff's home and more than three weeks after plaintiff's first proof of loss form was received to take steps to investigate plaintiff; although the investigator advised defendant shortly thereafter that there was no defense to the claim, defendant waited another two months before having an unlicensed builder to examine plaintiff's house; it was another month before defendant offered to settle the claim based on an estimate prepared by the unlicensed builder which was grossly inadequate when compared to five estimates furnished by plaintiff from a professional construction engineer and four licensed contractors; and defendant's investigating agent, with no basis whatever, told plaintiff's friends and neighbors that defendant had determined that plaintiff had his house burned for insurance purposes and offered money to two persons if they would help establish that plaintiff had his house burned.

### 3. Trial § 40.1— form of issues—failure to object

Defendant cannot complain on appeal about the form of the punitive damages issues where defendant made no objection at trial to the form of the issues but stated to the court that it had no objection to their form.

### 4. Appeal and Error § 31.1— failure to object to instructions

Where defendant failed to object to the court's instructions on punitive damages, it is conclusively presumed that the instructions conformed to the issues submitted and were without legal error. App. Rule 10(b)(2).

### 5. Principal and Agent § 4.2— proof of agency—out-of-court statements by alleged agent

An alleged agent's out-of-court statements to the effect that he was working for defendant insurer while investigating plaintiff could properly be considered on the question of agency when (1) the fact of agency appeared from other evidence, and (2) the statements were within the agent's actual or apparent authority.

### 6. Insurance § 136; Torts § 1; Trespass § 2— intentional infliction of emotional distress—insufficient evidence—expenses of insurance claim—failure to state claim

Plaintiff's evidence was insufficient to support his claim for intentional infliction of emotional distress by defendant insurer in refusing to settle plaintiff's fire insurance claim. Furthermore, plaintiff's allegations concerning expenses he incurred in presenting his fire insurance claim to defendant and pursuing this lawsuit did not state a claim for relief against defendant.

### 7. Insurance § 132; Interest § 2; Judgments § 55— fire insurance recovery—prejudgment interest

Plaintiff was properly permitted to recover prejudgment interest on the amount recovered under a fire insurance contract even though the exact amount due was not established until trial. G.S. 24-5.

### 8. Interest § 2; Judgments § 55— interest in contract case—issue before jury not required

G.S. 24-5 does not require that an issue be submitted to the jury before interest may be allowed in contract cases. The requirement of G.S. 24-5 that

the jury "distinguish the principal from the sum allowed as interest" pertains only to those rare situations where evidence as to both principal and interest is submitted to the jury for its consideration.

APPEAL by plaintiff and defendant from *Winberry, Judge.* Order entered 19 October 1983 in Superior Court, CRAVEN County. Heard in the Court of Appeals 16 November 1984.

In this civil action plaintiff seeks damages for defendant's alleged wrongs in failing to settle or pay plaintiff's claim under an insurance policy insuring plaintiff's house and personal property against loss by fire. The complaint sets forth three claims for relief, as follows: The *first claim*, for breach of contract in failing to pay the losses covered by the policy, seeks $157,500 for the fire damage done to the house and contents and $500 a month in living expenses for as long as the house remained uninhabitable. The *second claim*, based on defendant's alleged bad faith failure to settle its policy obligations, is for compensatory damages in the amount of $30,000 because of expenses allegedly incurred and time lost by plaintiff in pursuing the claim and this lawsuit; and for the embarrassment, humiliation, and mental distress that defendant's wrongs allegedly caused. The *third claim*, also based on defendant's bad faith refusal to settle the insurance claim, is for punitive damages in the amount of $200,000 and contains allegations that defendant refused to acknowledge plaintiff's damage estimates, to assign qualified agents to estimate the damage, and through its agent offered money to witnesses that would discredit plaintiff, and did other things to delay and inconvenience him. It was also alleged that Integon's bad faith failure to settle was wilful, wanton, malicious and intentional; for the wrongful purpose of pressuring plaintiff into accepting an unfair settlement; was a breach of its implied covenant of good faith and fair dealing and an abuse of its superior power under the policy, amounting to outrageous conduct. The defendant moved to dismiss all three claims pursuant to the provisions of Rule 12(b)(6) of the N.C. Rules of Civil Procedure; and upon the motion being heard Judge Rouse dismissed plaintiff's *second* and *third claims*, but permitted plaintiff's *first claim* to stand. On plaintiff's appeal to this Court it was ruled that plaintiff's *second* and *third claims* stated justiciable claims for relief and the order of dismissal was reversed. *Dailey v. Integon General Insurance Corp.*, 57 N.C. App. 346, 291 S.E. 2d 331 (1982).

When the case was finally tried, at the close of plaintiff's evidence the court directed a verdict against plaintiff on his *second claim*, but permitted the other claims to go to the jury, which rendered verdict for the plaintiff as follows: On the *first claim*, the plaintiff was awarded $105,000, the policy limits, for fire damage done to the house, $37,000 for fire damage done to the contents, and $15,000 for living expenses during the preceding thirty months that the premises had been uninhabitable. On the *third claim* for punitive damages, after finding that adjuster William T. Charnock was defendant's agent while investigating plaintiff's character, activities, and background in the New Bern area, the jury awarded plaintiff $20,000 for his wrongful conduct in maliciously and untruthfully notifying various neighbors and acquaintances of plaintiff that Integon had determined that plaintiff burned his house or caused it to be burned for insurance purposes; and awarded plaintiff $100,000 for defendant's wrongful failure to settle the claim in good faith. After judgment on the verdict was entered for plaintiff in the amount of $277,000, together with costs and prejudgment interest on the property damage award, defendant timely moved under Rule 50(b) of the N.C. Rules of Civil Procedure for judgment notwithstanding the verdict, and in the alternative for a new trial and for amendment of the judgment in various respects. The motion, heard 5 October 1983, was taken under advisement and on 19 October 1983 the court entered judgment notwithstanding the verdict for the defendant on both issues for punitive damages. In doing so the court ruled that though the allegations in the complaint were supported by evidence, the law of North Carolina does not allow punitive damages in a case based on breach of contract and it was error to submit the issues in the first place. Defendant's other motions were denied. Plaintiff appealed from the latter judgment, and defendant appealed from the denial of its other post-trial motions, but the only assignment of error that defendant has brought forward relates to the award of prejudgment interest on the property damage award of $142,000. Thus the validity of the $157,000 recovery under the policy is not before us. Defendant did bring forward several cross-assignments of error, however, by which it is maintained that various alternative grounds exist for upholding the judgment setting aside the verdict for punitive damages. The evidence relating to the many questions raised by the appeals and cross-assignments, viewed in its most favorable light for the plaintiff, tends to show the following:

Dailey v. Integon Ins. Corp.

In July of 1979 plaintiff and his wife moved into plaintiff's newly constructed, three level house situated in the River Bend community near New Bern. The property was insured against fire loss by an Integon homeowner's policy with limits of $100,000 on the house, $50,000 on the contents, and $21,000 for the Daileys' living expenses, at the rate of $500 a month upon the house being rendered uninhabitable. In June of 1980, when the policy came up for renewal, an Integon agent suggested that plaintiff increase his coverage by 5% because of inflation—to $105,000 for the house and $52,500 for the contents—and this was done. On 25 July 1980 while plaintiff and his wife were vacationing in Florida the house was rendered uninhabitable and its contents severely damaged by fire. An investigation by the Craven County Fire Marshal indicated that the fire was deliberately set by some unknown person, but the investigation eliminated plaintiff as a suspect. In early August Integon sent plaintiff a letter stating that a proof of loss form was enclosed, but the enclosure was a waiver of rights form, which plaintiff sent back, and it was about 27 August before Integon mailed the proof of loss form. With the aid of Integon's local agent plaintiff worked up the form and mailed it to Integon on 18 September 1980, but a few days later it was returned to plaintiff with the notation "rejected" across the top. A second proof of loss, prepared with the aid of defendant's agent, was mailed to defendant 13 October 1980, but it, too, was returned with a "rejected" notation on it. Some weeks later plaintiff mailed a third proof of loss to defendant, which was neither returned nor acted on for some weeks.

At the suggestion of one of Integon's adjusters, Phil Ellis, plaintiff obtained and submitted five estimates as to the cost of repairing the fire damage to his house, and plaintiff's wife prepared a list of the personal items and furnishings that were destroyed or damaged by the fire, along with the cost and age of each. Of the five estimates obtained by Dr. Dailey, one was by a professional construction engineer and the other four were by licensed contractors, each of whom had much experience building houses in Craven County. All of the estimators were of the opinion that the interior of the house had been rendered useless and that the second and third floors of the house, at least, should be demolished and rebuilt, and some of them were of the opinion that the entire structure to its foundation should be razed and re-

built. Each estimator was also of the opinion that the cost of accomplishing the needed repairs would exceed the policy limits of $105,000 and testified for plaintiff at trial. The one estimate Integon obtained was by a carpenter from Goldsboro, not licensed as a general contractor, who together with his son conducted a house building and repair business out of his home. He testified that he could have repaired the house "board by board" for $48,286.63 without tearing any portion of it down; and would have signed an agreement to repair the house for that price and would have acted as foreman while Integon served as the contractor, which he could not do since he had no contractor's license. In eventually submitting a settlement offer to plaintiff based on this estimate Integon did not know, so its claims examiner testified, that the estimator was not a licensed general contractor. Mrs. Dailey, with the help of local merchants who sold them some of the furnishings, clothing, and other items damaged or destroyed by the fire, estimated that it would cost $49,234.32 to replace the lost or damaged items and that their actual cash value when the fire occurred was $39,724.37. Integon's adjuster, Ellis, determined from an industry depreciation chart that the contents of the house had a value of only $23,487.36. While Ellis did not question the accuracy of Mrs. Dailey's list he depreciated the items substantially more than she did contending, among other things, that shoes over a year old had no value at all. On 26 January 1981, based largely on the unlicensed builder's estimate as to the house damage and Ellis' estimate of the value of the destroyed contents, Integon offered to settle Dr. Dailey's entire claim for $69,607.85.

Some weeks after the fire and before contacting the Craven County Fire Marshal Integon, through its chief claims examiner, engaged William T. Charnock of INS Investigations to determine whether Dr. Dailey was involved in the fire; and he instructed Charnock not to conduct a fire scene investigation but to conduct a background personal investigation of Dr. Dailey in Craven County. Charnock spent October 13, 14 and 15, 1980 in the New Bern area, during which time he interrogated Dr. Dailey, sixteen of the Daileys' neighbors or acquaintances, and the Craven County Fire Marshal. Charnock later sent a written report of his investigation to Integon and his bill for services rendered and expenses was paid in due course. Charnock asked one of the persons interrogated, Stephen Dentico, a number of questions, including: Whether

he knew that they had decided that the fire was an arson? If he thought that somebody had been hired to burn the house? If he had anything to do with the house being burned? If he had any knowledge of Dr. Dailey hiring anybody to burn the house? Dentico answered all these questions "no" and according to his testimony Charnock then said he had "determined this was a contract burning of the house and that it was done for insurance purposes"; and that he "knew that the house had been burned . . . for insurance purposes," and then offered Dentico a $10,000 fee and immunity from prosecution if he would sign a statement and testify that he was hired by Dr. Dailey to set fire to the house. Within a few days after Charnock's investigation started, Integon's chief claims examiner advised him that Dentico and another New Bern resident named Hinkle had accused him of offering each of them a $10,000 bribe if they would help establish that plaintiff had his house burned. Another neighbor of Dr. Dailey, Judy Burnette, testified that Charnock asked her if she knew of any reasons why he would want his house burned. The Craven County Fire Marshal, Henry P. Sermons, testified that Charnock told him "he had stirred up a lot of hate and discontent out there" and that he had offered Dentico $10,000 for information about Dr. Dailey's house fire. When Charnock took the stand he denied offering Dentico or Hinkle anything and said he only told Dentico that there was a $10,000 reward for catching arsonists and that if he had any involvement with the fire he should report to the fire marshal, who would speak to the prosecutor in his behalf.

*Sumrell, Sugg & Carmichael, by Fred M. Carmichael and Rudolph A. Ashton, III, for plaintiff appellant/appellee.*

*Dunn & Dunn, by Raymond E. Dunn, for defendant appellee/appellant.*

PHILLIPS, Judge.

Many questions, most of which are duplicating, overlapping, or related, are raised by the two appeals and defendant's numerous cross-assignments of error. The determination of these questions will be facilitated and this opinion greatly shortened by discussing the questions to the extent necessary, and some require no discussion, in connection with the subject that they relate to.

I

*The Award of Punitive Damages for Defendant's Bad Faith
Refusal to Settle Plaintiff's Contract Claim and for the
Malicious Acts of its Agent Charnock in Furtherance Thereof*

The defendant's liability to plaintiff under the policy in the amount of $157,000 has been set at rest. The primary question raised by plaintiff's appeal is whether the verdict for punitive damages was erroneously set aside. Stated a different way, are punitive damages recoverable in this state where the basic, underlying claim is for breach of contract?

a.

[1] The general rule in North Carolina is that punitive or exemplary damages are not recoverable for a mere breach of contract, unless the contract is to marry. *King v. Insurance Company of North America*, 273 N.C. 396, 159 S.E. 2d 891 (1968). But nearly ten years ago our Supreme Court, in a plurality opinion by Justice Copeland, recognized that punitive damages might be appropriate in breach of contract actions that "smack of tort because of the fraud and deceit involved" or those actions "with substantial tort overtones emanating from the fraud and deceit." *Oestreicher v. American National Stores*, 290 N.C. 118, 136, 225 S.E. 2d 797, 809 (1976). In a later opinion by Justice Exum, citing *Oestreicher*, the exception to the rule was stated as follows: "Nevertheless, when there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort may itself give rise to a claim for punitive damages." *Newton v. Standard Fire Insurance Co.*, 291 N.C. 105, 111, 229 S.E. 2d 297, 301 (1976). But the Court added the following qualification: "Even when sufficient facts are alleged to make out an identifiable tort, however, the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed." *Id.* at 112, 229 S.E. 2d at 301. In the sense used here, aggravated conduct has long been defined to include "fraud, malice, gross negligence, insult, . . . wilfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." *Baker v. Winslow*, 184 N.C. 1, 5, 113 S.E. 570, 572 (1922). During the nine years since *Newton*, our courts have relied on this exception at least three times in holding that a party to an action for breach of contract

had also stated a claim for punitive damages. *Stanback v. Stanback*, 297 N.C. 181, 254 S.E. 2d 611 (1979); *Payne v. N.C. Farm Bureau Mutual Insurance Co.*, 67 N.C. App. 692, 313 S.E. 2d 912 (1984); and *Dailey v. Integon*, 57 N.C. App. 346, 291 S.E. 2d 331 (1982), the earlier appeal in this case. In each of these cases, it was held that the trial court erroneously dismissed the plaintiff's claim for punitive damages under Rule 12(b)(6) of the N.C. Rules of Civil Procedure. In *Payne v. N.C. Farm Bureau Mutual Insurance Co.*, the plea for punitive damages was also based on an insurance company's bad faith refusal to settle a policy claim and in reversing the trial court's dismissal on the pleadings, the decision in *Dailey* was relied upon. These decisions clearly support the proposition that under some circumstances our law permits the recovery of punitive damages on claims for a tortious, bad faith refusal to settle under an insurance policy, even though, as in this instance, the refusal to settle is also a breach of contract. Thus, the judgment to the contrary by the trial court was error.

b.

[2] Because this is an appeal from a judgment *non obstante veredicto*, instead of a dismissal under Rule 12(b)(6), the main question presented is somewhat different from the one adjudicated in the other cases above referred to. The question raised by a judgment *non obstante veredicto* is essentially the same as that raised by a directed verdict. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E. 2d 897 (1974). In resolving the question—whether the evidence is sufficient to support the verdict—the evidence, of course, must be viewed in the light most favorable to the party who won the verdict. *Potts v. Burnette*, 301 N.C. 663, 273 S.E. 2d 285 (1981). In contending that the verdict was erroneously upset, plaintiff strongly relies upon this Court's earlier holding that his complaint sufficiently alleged a tortious act with accompanying aggravation to support an award of punitive damages. In our opinion this position is well taken. The evidence produced at trial is clearly sufficient, we think, to support the jury's finding that with accompanying aggravation of a very high degree, indeed, defendant tortiously refused in bad faith to settle plaintiff's claim. Defendant's argument that plaintiff failed to prove the existence of a "separate identifiable tort" is based on a misreading of the law. None of the cases discussed above require proof of a *separate* identifiable tort unrelated to the contract, as defendant

seemingly maintains. On the contrary our Supreme Court has stated that the tort need only be "identifiable" and that punitive damages may be recoverable "even though the tort also *consti-tutes . . . a breach of contract.*" (Emphasis added.) *Newton v. Standard Fire Insurance Co., supra* at 111, 229 S.E. 2d at 301. In this case, according to the evidence, the identifiable tort alleged — defendant's bad faith refusal to settle — not only accompanied the breach of contract, it also was a breach of contract that was accomplished or accompanied by some element of aggravation. *Id.* at 112, 229 S.E. 2d at 301; *Dailey v. Integon, supra* at 350, 291 S.E. 2d at 333. That Integon breached the contract has been set at rest and was established by evidence mainly to the effect that its failure to pay plaintiff's loss was not excused by any provision in the policy. That this breach was accomplished in bad faith is indicated by the great volume of evidence which tends to show that defendant's refusal to pay or settle plaintiff's claim on any reasonable basis was not based on honest disagreement or innocent mistake. *Newton v. Standard Fire Insurance Co., Payne v. N.C. Farm Bureau Mutual Insurance Co.,* and *Dailey v. Integon,* all *supra.* And the record is replete with evidence of defendant's malice, oppression, wilfulness and reckless indifference to consequences. *Newton v. Standard Fire Insurance Co., supra* at 112, 229 S.E. 2d at 301.

The evidence indicates that though the fire occurred on 25 July 1980, and it was immediately obvious that defendant's potential liability under the policy was substantial, it was not until 10 October 1980, two and a half months after the fire and more than three weeks after plaintiff's first proof of loss was received — the proof of loss itself having been delayed for some weeks by defendant's failure to send the form in its first mailing — that defendant took steps to have plaintiff investigated, and that though Charnock advised defendant shortly after 15 October that the investigation was fruitless and there was no defense to the claim, it was not until 17 December 1980, two months later and nearly five months after the fire, that defendant had an unlicensed builder, whose lack of qualifications to do the work were not checked, to examine the house, and it was a month after that before defendant offered to settle the claim based on that builder's estimate, which was grossly inadequate. This evidence and the other evidence above stated fairly shows, we think, that after arbitrarily

rejecting plaintiff's well documented claim defendant took no steps at all to check plaintiff's estimated construction costs for several months and then selected an unqualified builder to do the checking, and then waited another month before making a settlement offer for the real property loss that had no reasonable basis and an offer to settle the contents loss that disregarded the actual utility and value of the destroyed items.

The evidence supports the conclusion, we think, that defendant's effort to settle plaintiff's claim consisted of requiring him to go to the inconvenience and expense of obtaining qualified, expert estimates defendant had no intention of considering; inordinately delaying both the settlement and plaintiff's return to his usual comforts and amenities of life; and then offering about half the amount owed in anticipation that plaintiff would have neither the will nor the resources to refuse it. More aggravated, oppressive conduct, not involving physical force or personal insult, by one having a duty to relieve financial distress and inconvenience is hard to imagine. But that was not all. Defendant, through its agent Charnock, also told some of plaintiff's friends and neighbors, with no basis whatever, that it had determined that plaintiff had his house burned "for insurance purposes," and "stirred up a lot of hate and discontent" against plaintiff among his neighbors.

When taking defendant's motion to set aside the verdict under advisement the trial judge, who heard and saw the testifying witnesses, appraised defendant's conduct as follows:

> I would say to you in all candor that when this jury went out that I went and called my insurance agent to check that my fire insurance wasn't with your client. There is no question in my mind based on the evidence I heard that your client did not act in good faith in settling this claim. I wouldn't any more let those two people in Goldsboro work on my house, much less go inside my house than anything. I can understand why the jury would feel the same way. The plaintiff on the one hand offered uncontested evidence from five licensed contractors who build the majority of the homes apparently in the New Bern area as to the cost of repair and the only evidence really that you had was two people from Goldsboro, a father and son team who were going to work at six percent

profit and use their profit—just give up their profit—to buy all the extra materials they would need; and you know, I love American businessmen but I just never have met two quite as kind as those people. It was just a little far fetched, you know, that legitimate licensed contractors could be so far afield from these two people. I think that your client in representing that those two gentlemen from Goldsboro were competent in good faith to repair this home breached a duty that they had to their policyholder; and, then they would come along with an appraiser who testifies as to the personal property that every pair of shoes I have which is over a year old has no cash value whatsoever and when that is coupled with an investigator who comes down and tours the neighborhood and goes and talks to others and conducts himself as the jury found he did then I think the evidence clearly supports the punitive damage verdict if that verdict, if that issue, were properly to be submitted to the jury.

The jury's finding that defendant's conduct was tortious and warranted punishment has the sanction of law, in our opinion, and it was error to disturb it. Thus, the judgment of the trial court setting aside the punitive damages awarded is vacated and upon remand the jury verdict with respect thereto will be reinstated. By five cross-assignments of error the defendant maintains that the evidence does not support the punitive damage awards and that even if the judge erred in ruling that our law does not authorize punitive damages in cases of this kind the judgment appealed from should nevertheless be upheld. These contentions were considered and rejected in determining that the evidence of defendant's tortious and aggravating conduct is sufficient to support the awards made, and discussing defendant's contentions *ad seriatim* would serve no useful purpose.

[3, 4] By two further cross-assignments of error defendant also maintains that the punitive damages issues were erroneously formed and that this is still another alternative ground for upholding the setting aside of the verdict. But the record plainly shows not only that defendant made no objection to the form of these issues, but expressly stated to the court before they were submitted that it had no objection to their particular form. Since the defendant tried the case to a conclusion without ever raising these questions and giving the trial court an opportunity to rule

on them, we will not consider them now. *Kim v. Professional Business Brokers, Ltd.*, 74 N.C. App. 48, 328 S.E. 2d 296 (1985). Nor did the defendant object to the court's instructions to the jury on these issues or any others, for that matter, and under the provisions of Rule 10(b)(2) of the N.C. Rules of Appellate Procedure, it is conclusively presumed that the instructions conformed to the issues submitted and were without legal error. *Hanna v. Brady*, 73 N.C. App. 521, 327 S.E. 2d 22 (1985).

II

*Evidence that Charnock was Defendant's Agent*

[5]  By several other cross-assignments of error defendant contends that the jury verdict that Charnock was defendant's agent during his three-day investigation of plaintiff in Craven County is not sufficiently supported by admissible evidence. It is particularly contended that plaintiff and some of his witnesses were erroneously permitted to testify as to certain out-of-court statements by Charnock to the effect that he was working for Integon while investigating the plaintiff in Craven County. As defendant correctly maintains, the general rule is that neither the fact nor the extent of an agency relationship can be proved by the out-of-court statements of an alleged agent. *Branch v. Dempsey*, 265 N.C. 733, 145 S.E. 2d 395 (1965). But it is also the rule that such statements may be considered as evidence on the question of agency when (1) the fact of agency appears from other evidence and (2) the statements were within the agent's actual or apparent authority. *Branch v. Dempsey, supra; Commercial Solvents v. Johnson*, 235 N.C. 237, 69 S.E. 2d 716 (1952); *New Hanover County v. Twisdale*, 42 N.C. App. 472, 256 S.E. 2d 840 (1979). The "other evidence" required by the latter rule was presented. Before trial plaintiff submitted an interrogatory requiring defendant to list the name, address, and dates of investigation of "all individuals employed or hired by the defendant corporation and all of defendant's *agents* and *employees* that investigated the fire that caused the damage to the plaintiff's dwelling . . ." (Emphasis supplied.) In response thereto defendant listed Bill Charnock, among others, gave his Richmond address, and stated that his investigation was made between "October 2, 1980 through 11-2-80. Exact dates of investigation unknown." The interrogatories and answers, received into evidence, were sufficient to establish Charnock's agency dur-

ing the investigation that he conducted for the defendant. Thus, the statements Charnock made to plaintiff's witnesses were also admissible, both as to his agency and as part of the *res gestae* of the tortious breach. *Commercial Solvents v. Johnson, supra;* *Robinson v. Whitley Moving and Storage, Inc.*, 37 N.C. App. 638, 246 S.E. 2d 839 (1978). But both Charnock's agency and that he acted within the scope and course of it was shown by other evidence as well. Defendant's chief claims examiner, William L. Armour, testified that he hired Charnock after telephoning him on 10 October 1980 and instructed him to do a background investigation on plaintiff personally in the New Bern area and give them an opinion as to whether plaintiff had anything to do with the fire. And Charnock himself testified that he did the investigation on 13, 14 and 15 October, 1980, during the course of which he told the several persons interviewed that he was investigating plaintiff for Integon and made remarks to the witness, Dentico, that were similar in several respects to the bribery offer that Dentico testified to. Thus, even if it was error to receive the testimony initially, and we do not believe it was, the error was cured. We also note that the rule of evidence invoked here by defendant has since been superseded by the adoption of the N.C. Rules of Evidence, Chapter 8C of the General Statutes (effective 1 July 1984), under which the challenged statements would be clearly admissible. *See generally*, 2 Brandis *N.C. Evidence* § 169 (1982 and Supp. 1983). All of defendant's cross-assignments of error relating to the testimony concerning Charnock are therefore overruled.

### III

### *The Directed Verdict Against Compensatory Damages on Plaintiff's Second Claim*

[6] Returning to plaintiff's appeal, was it error for the trial court to direct a verdict against plaintiff's *second claim* for compensatory damages because of expenses that he incurred and emotional distress that he suffered as a result of defendant's bad faith refusal to settle his claim? Plaintiff argues that the dismissal of this claim violated the mandate of this Court following the first appeal. We disagree. There is a difference between sufficiently alleging a claim and sufficiently proving it. The tort of intentional infliction of emotional distress was recognized in the case of *Stan-*

*back v. Stanback, supra. See also, Morrow v. King's Department Stores*, 57 N.C. App. 13, 290 S.E. 2d 732, *disc. rev. denied*, 306 N.C. 385, 294 S.E. 2d 210 (1982). Plaintiff in *Stanback*, on appeal from a dismissal under Rule 12(b)(6), alleged that defendant's conduct in breaching a separation agreement was "wilful, malicious, calculated, deliberate and purposeful . . . ;" that defendant acted recklessly, irresponsibly and "with full knowledge of the consequences that would result . . . ;" and that plaintiff "suffered great mental anguish and anxiety as a result" of defendant's actions. *Stanback v. Stanback, supra* at 198, 254 S.E. 2d at 622-23. Those allegations stated a claim, so our Supreme Court held, and under that holding plaintiff in this case clearly alleged a sufficient claim for emotional distress, as this Court held on the first appeal. *Dailey v. Integon, supra.* But in our search of the record we found no testimony whatever to indicate that plaintiff suffered emotional distress, compensable or otherwise, because of defendant's bad faith refusal to settle his claim. Such injury cannot be assumed, but must be proved by evidence.

The other part of this claim seeks recovery for fees plaintiff paid out for construction and repair estimates, photographs, expert witnesses, and other things in processing the claim and this lawsuit. But, under our law, such losses are not recoverable as damages unless authorized by statute, *City of Charlotte v. McNeely*, 281 N.C. 684, 190 S.E. 2d 179 (1972), and we do not believe that the Court intended in the earlier appeal to contradict this long-standing rule. It only intended to rule, we feel sure, that plaintiff's *second claim*, which is based on both emotional distress suffered and expenses incurred, states a claim for which legal relief can be granted. Which it does, as above noted, through the allegations concerning the intentional infliction of emotional distress. But the allegations made concerning the expenses plaintiff incurred in presenting his claim to the defendant and in preparing and pursuing this lawsuit do not state a claim that will support legal relief, and *Dailey v. Integon, supra* should not be construed as holding otherwise.

IV

*Evidence of Other Alleged Derelictions by Defendant*

During the course of the trial plaintiff unsuccessfully sought to introduce testimony by two former insureds of the defendant

that they were treated almost identically the way the evidence indicates plaintiff was treated. And plaintiff was not permitted to offer evidence as to the fact that more than a year after the lawsuit was filed, defendant purchased the note and deed of trust on his property from the original mortgagee and that a few days before the trial defense counsel wrote a letter to plaintiff and his counsel, stating that defendant held the note and deed of trust, and since plaintiff was behind in his payments defendant was exercising its option to accelerate the remaining payments due, and to demand that the full balance due, including interest and late charges, be paid at once. Plaintiff's contention that the excluded evidence should have been received into evidence because it tends to show defendant's bad faith, overreaching, and wilfulness will not be ruled on, since a new trial is not being granted.

V

*Prejudgment Interest on Amount Recovered Under the Policy*

[7]   Under the terms of its policy defendant was required to pay plaintiff the amount due thereunder for damage done to the house and personal property within sixty days after proof of loss was filed. Since plaintiff's first proof of loss was sent to defendant on 18 September 1980, the trial court in entering judgment ordered that interest attach to the $142,000 recovered for the house and contents damage from 18 November 1980 until paid. Defendant contends that this order was erroneous because those damages were unliquidated and undetermined until the verdict was rendered. This contention is without merit and we overrule it. A policy of insurance is a contract. The amount defendant owed plaintiff was due under its policy and the statutory basis for the award of prejudgment interest in this case could not be plainer. G.S. 24-5, in pertinent part, provides as follows:

> All sums of money due by contract of any kind, excepting money due on penal bonds, shall bear interest, and when a jury shall render verdict therefor they shall distinguish the principal from the sum allowed as interest; . . .

Nothing in this provision supports the proposition that a party obligated by contract to pay money to another can use the other party's money at no cost merely because the exact amount due has not already been established. Indications to the contrary in

some earlier cases have long since been abandoned. In *Perry v. Norton*, 182 N.C. 585, 109 S.E. 641 (1921), a suit based on the equitable principles of *quantum meruit*, interest was allowed on the sum due plaintiff for services rendered and improvements made to defendant's property four years earlier. As to the trial judge's allowance of interest from the time payment was due, the Court said:

> In this the trial judge simply followed the law as established by the decisions of this Court. . . . The statute says that all sums of money due by contract of this kind, excepting money due on penal bonds, shall bear interest. . . . From this it would seem to follow in this State that whenever a recovery is had for a breach of contract and "the amount is ascertained from the terms of the contract itself or for (sic) evidence relevant to the inquiry," that interest should be added.

182 N.C. at 589, 109 S.E. at 643. In *Thomas v. Piedmont Realty and Development Company*, 195 N.C. 591, 143 S.E. 144 (1928), prejudgment interest was allowed on plaintiff's *quantum meruit* recovery for services performed as a broker. In *Harris and Harris Construction Company, Inc. v. Crain and Denbo, Inc.*, 256 N.C. 110, 127, 123 S.E. 2d 590, 602 (1962), the Court said there was a definite trend in this State toward the "allowance of interest in almost all types of cases involving breach of contract," and approved prejudgment interest on the unliquidated balance due a subcontractor. In *General Metals, Inc. v. Truitt Manufacturing Company*, 259 N.C. 709, 131 S.E. 2d 360 (1963), interest on a disputed, unliquidated contractor's claim was allowed from the time the job was completed.

[8] Nor does G.S. 24-5 require that an issue be submitted to the jury before interest can be allowed in contract cases. The requirement is merely that the jury "distinguish the principal from the sum allowed as interest," which obviously pertains only to those rare situations where *evidence as to both principal and interest* is submitted to the jury for their consideration. This distinction was recognized in the early case of *DeLoach v. Work*, 10 N.C. (3 Hawks) 36 (1824), and has been restated in several decisions since then including *Perry v. Norton* and *Thomas v. Piedmont Realty and Development Company*, both *supra*. In this case, computing the interest due was a mere clerical matter, and it would have

been an absurd, pointless waste of time to ask the jury to "distinguish" between principal and interest.

As to plaintiff's appeal (a) the judgment setting aside the verdict on Issues 5 and 6 is vacated and on remand the judgment for punitive damages originally entered thereon will be reinstated; (b) the verdict directed against plaintiff's *second claim* is affirmed.

As to defendant's appeal and cross-assignments, the judgment appealed from is affirmed and all the cross-assignments of error are denied.

Affirmed in part; vacated and remanded in part.

Judges WHICHARD and JOHNSON concur.