**Karen C. MICHAEL, Plaintiff,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

No. C–C–85–44–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

March 28, 1986.
As Amended April 18, 1986.

---

Donald H. Beskind, Beskind & Rudolf, Durham, N.C., for plaintiff.

George K. Evans, Jr., Cansler & Lockhart, Charlotte, N.C., John L. Viola, New York City, for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

This is an action by the Plaintiff, Karen C. Michael, against the Defendant, Metropolitan Life Insurance Company, for punitive damages in an amount of One Million Dollars for bad faith in its dealings with the Plaintiff, and "... the tortious and outrageous conduct of the Defendant ..." in connection with the Plaintiff's claim of benefits under a group medical insurance policy.

The Plaintiff was represented by Donald A. Beskind, Esquire and the Defendant was represented by George K. Evans of the North Carolina Bar and John L. Viola of the New York Bar.

## FINDINGS OF FACT

(1) Plaintiff Karen C. Michael is a citizen and resident of the State of North Carolina, County of Mecklenburg, in the Western District of North Carolina.

(2) Defendant is an insurance company organized under the laws of the State of New York, with its principal place of business in the City of New York.

(3) The Plaintiff was an employee of an agency of the United Way of Mecklenburg and Union Counties, Inc. to which was issued Defendant's group Policy No. 25587–G (Def.Ex. 1 and 2).

(4) The policy provided among other things that it would pay certain covered expenses defined as follows:

*Covered Medical Expenses*

"Covered Medical Expenses" means reasonable, necessary, and customary expenses of the following types which are incurred for medical services rendered to the Employee ... and which, unless specifically stated otherwise, are performed or prescribed by a physician or surgeon, subject to the exclusions set forth below:

*EXCLUSIONS*

(g) Services or supplies which are not necessary in terms of generally accepted medical standards, or which are deemed to be experimental in terms of generally accepted medical standards.

(5) The Plaintiff, while covered by the Defendant's policy, had incurred numerous claims against the policy (Def.'s Ex. 24 through 39 and 43 through 45), which including subject claim totaled $12,221.03. Prior to the subject claim, the Plaintiff had not had any problems with any of her claims made to the Defendant.

(6) The Plaintiff first learned that she had a fertility problem in about 1981.

(7) In the summer of 1982 the Plaintiff first learned of the In-Vitro Fertilization (IVF) program at North Carolina Memorial Hospital in Chapel Hill supervised by Dr. Luther Talbert.

(8) She and her husband, Mark Michael, a practicing attorney in Charlotte, North Carolina, visited Dr. Talbert in about April

of 1984, and were told that the cost of the IVF procedure would be approximately $3,700.00, that the procedure had about a 20% success rate, that it required her to remain in Chapel Hill for approximately two weeks and that payment had to be made in advance because insurance companies had been refusing claims for the procedure. (See Page 9, Line 16 through Page 10, Line 14, and Page 12, Line 11, through Page 15, Line 19. Deposition of Lacy Farrell, Manager Patient Accounts, Medical Family Practice Plan).

(9) There was not any discussion between the Plaintiff and her husband as to whether the procedure would be covered by the Defendant's group policy until her claim was denied by the Defendant. In fact, the Plaintiff never looked at her policy to determine if IVF was covered.

(10) The Plaintiff underwent the procedure, which was successful.

(11) The claim for benefits was denied by the Defendant's claims office in Greenville, South Carolina (Def.Ex. 6, Pl.Ex. 8).

(12) The Plaintiff, although not surprised at the denial, requested an explanation of the denial by letter dated September 26, 1984 (Pl.Ex. 9).

(13) The Defendant responded on October 9, 1984 that IVF was not yet considered to be a generally accepted standard of medical practice or necessary and customary treatment (Pl.Ex. 10).

(14) The Plaintiff responded with a letter from her attorney dated November 14, 1984 threatening to sue and warning that punitive damages would be sought, and attaching an undated document from the American Fertility Society stating that in July 1983, a preamble had been approved at the President's Council Meeting and a form letter from Talbert dated October 30, 1984 to the effect that IVF was now an established and acceptable clinical procedure. (Pl.Ex. 11). There is no evidence as to what is the American Fertility Society, or what standing it has, simply the bare bones exhibit.

(15) The Defendant responded to Plaintiff's attorney by letter dated November 16, 1984 advising that he would be advised promptly upon completion of review of Plaintiff's case (Def.Ex. 11).

(16) The Defendant's Greenville claims office forwarded the Plaintiff's file to Group Staff Operations on November 28, 1984.

(17) On December 20, 1984, Plaintiff's attorney wrote Defendant's Greenville, South Carolina claims office warning that if the Plaintiff's claim was not paid by January 1, suit would be filed by January 2. (Pl.Ex. 14).

(18) In the meantime, John M. Festa, Supervisor of Defendant's Claims Planning and Policies Section (CP&P) had consulted with Dr. John T. Henriques from the Defendant's medical department on or about December 6, 1984. (Pl.Ex. 27, Page 3, ¶ 5).

(19) On December 12, 1984, as a result of Festa's conversation with Dr. Henriques on December 6, 1984, the recommendation from Claims Advisory Committee (CAC), the AMA Article (Def.Ex. 20), the American College of Obstetricians and Gynecologists (ACOG) statement dated November 19, 1980 (Def.Ex. 15), and April 1984 (Def.Ex. 22), Charles J. McCormick, Vice President of CP&P for Defendant, told Festa he wanted something in writing. Festa wrote McCormick, advising that based on research, surveys of other insurance companies and the absence of a specific policy exclusion it was his (Festa's) opinion that IVF should be considered a clinically acceptable procedure payable under Group Insurance Policies. (Pl.Ex. 13).

(20) After a series of meetings between John M. Festa, Supervisor, CP&P, Ralph Jeffrey, Associate Vice President, CP&P, C.J. McCormick, Vice President, CP&P, and Richard S. Walsh, Vice President, Group Staff Operations, Messrs. Walsh and McCormick determined that the policy concerning payments for IVF procedures should not be changed from that announced by Claims Release 82–Med–27 (Def.Ex. 4), because the procedure was new, success rate was 20%, there was an

evolving position by different groups, and not clear cut enough to take out of experimental category.

(21) One of the considerations in the decision was Defendant's responsibility as an ERISA fiduciary to act prudently toward group policy holders as well as individual claimants.

(22) This decision was communicated to the Greenville claims office on December 27, 1984, by Festa (Pl.Ex. 16).

(23) In turn the Defendant's decision was communicated by Di Lorenzo's, Manager of the Greenville claims office, to Plaintiff's attorney by letter dated January 3, 1985 (Pl.Ex. 17).

(24) Di Lorenzo simultaneously with his letter to Plaintiff's attorney advised Ms. Massey, Associate Manager, that if the Defendant were sued, to notify John Festa, and Mr. Harmon so that local counsel could be obtained (Pl.Ex. 18).

(25) Plaintiff filed her lawsuit January 18, 1985, which was served on Defendant on *January 28, 1985*. She sued for a million dollars punitive damages to get Defendant's attention.

(26) The Defendant continued to evaluate its position in January and February of 1985, and in late February the decision to change the policy was made, and a Claims Release dated May 14, 1985 was issued (85–Med–13) authorizing payment of IVF charges on and after April 1, 1984 (Def.Ex. 5).

(27) On March 11, 1985, the Defendant's attorney sent a check to the Plaintiff for the full amount of her claim, $3,244.23 (Pl.Ex. 20).

(28) Metropolitan Life Insurance Company was incorporated in 1868 and became a mutual company in 1915. It operates in all the United States, Canada and Puerto Rico.

(29) The Defendant is the second largest insurance company in the country, has 40,-000 employees and processes 17 million medical claims each year, and is No. 1 in the Group Business.

(30) Any major decision on policies is made by Claim Releases, which are sent to all the claims offices of the Company.

(31) Prior to 1984, the last claims release on the subject of IVF was Defendant's Claims Release Number 82–Med–27 dated December 10, 1982. (Def.Ex. 4). That document stated that IVF was not yet considered to be a generally accepted medical technique and that the expenses in connection with IVF were to be excluded as not reasonable, necessary and customary.

(32) Prior to Plaintiff's claim, only two known IVF claims had been received at Defendant's Greenville claims office.

(33) Claims Releases are prepared by Metropolitan's Claims Planning & Policies Section (CP&P). The Company's 20 claims offices cannot overide CP&P unless there is specific contractual language. The Claims Advisory Committee (CAC) is made up of representatives from a number of different departments and provides a forum for all parties to come together. It is a committee which makes recommendations to CP&P.

(34) Medical technology and procedures have made great strides and are rapidly changing from month to month. In recent years there have been advances in heart, liver, kidney, and bone transplants, for example. These were at one time considered experimental in terms of generally accepted medical standards and claims for such services were refused. However, in late 1983 or 1984, this changed and claims for such services were paid by the company. On the other hand, "gravitronics", *i.e.*, hanging upside down to relieve disk problems is still considered experimental and payment is not made. An article in *Time Magazine* dated September 10, 1984, points out that the age of the test tube baby is fast developing (Def.Ex. 16). The world's first test tube baby was born in 1978. The first IVF birth in the United States was in December, 1981 (Def.Ex. 22).

(35) In the field of IVF, the Company paid one claim in 1983, and that was in error.

(36) In September of 1983 CAC recommended payment for artificial insemination, but the IVF position was reaffirmed.

(37) On January 24, 1985 (four days *before* Plaintiff's lawsuit was served on Defendant) Festa assigned one of his associates, Diana Belmont, to look into the issue again and find out if anything new could be determined and to give him her opinion regarding IVF. The response dated February 4, 1985, was that IVF was still experimental.

(38) In September of 1984, few insurance companies were willing to pay for IVF (Def.Ex. 16).

## ANALYSIS

The Defendant having paid the Plaintiff's claim the Plaintiff is asking for punitive damages and attorney's fees "... by virtue of the bad faith of the Defendant in its dealings with the Plaintiff and the tortious conduct of the Defendant" as claimed in ¶ 12 of Plaintiff's Complaint.

The Court does not agree that based on the evidence and the Findings of Fact by this Court, which are supported by the evidence, that either attorney's fees or that punitive damages are recoverable by the Plaintiff.

Punitive damages are recoverable in North Carolina when there is an identifiable tort. The tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed. *Newton v. Standard Fire Insurance Co.*, 291 N.C. 105, 110, 229 S.E.2d 297, 301 (1976).

Aggravated conduct has long been defined to include fraud, malice, gross negligence, insult, willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights. *Baker v. Winslow*, 184 N.C. 1, 5, 113 S.E. 570, 572 (1922).

Bad faith refusal by an insurance company to settle a policy claim permits the recovery of punitive damages on claims for a tortious, bad faith refusal to settle. *Dai-*

*ley v. Integon General Ins. Co.*, 75 N.C. App. 387, 331 S.E.2d 148 (1985).

Punitive damages are never awarded as compensation. They are awarded above and beyond actual damages, as a punishment for the Defendant's intentional wrongdoing. They are given to the Plaintiff in a proper case, not because they are due, but because of the opportunity the case affords the Court to inflict punishment for conduct intentionally wrongful. *Transportation Co. v. Brotherhood*, 257 N.C. 18, 30, 125 S.E.2d 277, 286, *cert. denied*, 371 U.S. 862, 83 S.Ct. 120, 9 L.Ed.2d 100, *reh. denied*, 371 U.S. 899, 83 S.Ct. 182, 9 L.Ed.2d 131 (1962).

In order for the Plaintiff to recover on her claim for punitive damages under North Carolina law, she would have to produce evidence that the Defendant had determined that the claim was valid and that the Defendant nevertheless refused to pay *and* that such refusal was in bad faith *with intent to cause further damage to Plaintiff.* There is nothing in this evidence to warrant a finding by this Court that the Defendant's denial of Plaintiff's claim was in bad faith with intent to cause further damage to this Plaintiff. *Newton v. Insurance Co., supra.*

In the case at bar, we have a group policy purchased by an employer the rates for which are affected by loss experience. There was a delay in paying the claim, but the evidence is that this was an ongoing decision-making process within the company to arrive at a conclusion which would affect not just the Plaintiff, but thousands of other claimants. Further, this was not a catastrophic unexpected financial burden on the Plaintiff. It was a deliberate decision on her part to seek pregnancy by a admittedly new and novel procedure, which the Plaintiff would have proceeded with whether or not it was covered by insurance. In fact, neither the Plaintiff nor her husband looked at the insurance policy before or after their consultation with Dr. Talbert who was going to perform the procedure, and they would have proceeded,

even if they had known the Defendant would deny coverage.

There was no negotiation with the Plaintiff to try to have her accept a lesser amount of payment. The Defendant was not trying to cut its losses at the expense of the Plaintiff. The Defendant was conscientiously trying to arrive at a business decision which would meet its contractual obligations and at the same time not penalize its remaining policy holders by raising their premiums to cover obligations it had not contracted for.

A court should be slow to impose upon an insurer liabilities beyond those called for in its contract of insurance. Both the insurer and the insured enter into a contract and agree on the premiums with an agreement as to what the policy does and does not cover. If the insurer pays claims it has not agreed in its policy to pay for the premium it has collected then obviously the public is going to be charged increased premiums for the payments made by the insurance company outside its obligation under the contract with the claimant.

Obviously neither the public nor the policy holders would benefit from the Court's punishing an insurance company for being deliberate in determining if a claim is within the contractual provisions of its policy.

The Plaintiff has also asked for attorney's fees as provided for in North Carolina G.S. 6–21.1 which provides:

> In any ... suit against an insurance company under a policy issued by the defendant insurance company and in which the insured ... is the plaintiff, upon a finding by the court that there was an unwarranted refusal by the defendant insurance company to pay the claim which constitutes the basis of the suit, instituted in a court of record, the presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the litigant obtaining a judgment for damages in said suit, said attorney's fees to be taxed as part of the court costs.

The Court does not find that Defendant's refusal to pay the Plaintiff's claim until it did was unwarranted. It was a business decision which the Defendant made in the usual course of its business and was not made for the purpose of discouraging the Plaintiff in the hope that she and her claim would "go away."

Any finding of fact which is deemed a conclusion of law is so deemed, and any conclusion of law which is deemed a finding of fact will be so deemed.

## CONCLUSIONS OF LAW

The Court has jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332.

From the evidence, Defendant's conduct did not demonstrate actual malice, oppression, gross and willfull wrong, insult, indignity or a reckless disregard of Plaintiff's rights, which would warrant recovery of punitive damages.

Neither does the Court conclude that there was an unwarranted refusal by the Defendant insurance company to pay claims of the Plaintiff, which would justify an allowance of attorney's fees to be taxed by the Court.

A judgment dismissing the Plaintiff's action with prejudice will be filed simultaneously with this Memorandum.