Bank of America Corp. v. SR Int'l Bus. Ins. Co., SE, 2007 NCBC 36

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
05 CVS 5564

BANK OF AMERICA CORPORATION

and

BANC OF AMERICA SECURITIES, LLC,

        Plaintiffs,

v.

SR INTERNATIONAL BUSINESS
INSURANCE COMPANY, SE,

        Defendant.

**ORDER AND OPINION**

{1}    This matter is before the Court on Plaintiffs' Motion for Summary Judgment, Plaintiffs' Motion In Limine to Exclude from Evidence the Report and Testimony of Defendant's Expert Witness Mr. George L. Priest, and Defendant's Motion for Partial Summary Judgment. Plaintiffs' summary judgment motion is GRANTED IN PART and DENIED IN PART. The motion to exclude Professor Priest's report is GRANTED. Defendant's motion for partial summary judgment is GRANTED.

> *King & Spalding LLP by George Covington, Dwight J. Davis, Martin M. McNerney, and Emily R. Sweet for Plaintiffs Bank of America Corporation and Banc of America Securities, LLC.*
>
> *Smith Moore LLP by L. Cooper Harrell, Jonathan P. Heyl, Robert R. Marcus, and Larry B. Sitton; Boies, Schiller & Flexner LLP by David Boies and Edward J. Normand for Defendant SR International Business Insurance Company, SE.*

Tennille, Judge.

# I.

## PROCEDURAL BACKGROUND

{2}     This action was filed in Mecklenburg County on March 23, 2005.  The matter was designated a complex business case and assigned to the Honorable Ben F. Tennille, Chief Special Superior Court Judge for Complex Business Cases, by Order of the Chief Justice of the Supreme Court of North Carolina dated June 15, 2005.

{3}     Defendant filed a Motion for Partial Summary Judgment under Rule 56 of the North Carolina Rules of Civil Procedure on October 1, 2007.  Plaintiffs filed a Motion for Summary Judgment under Rule 56 of the North Carolina Rules of Civil Procedure on October 1, 2007.  Plaintiffs filed a Motion in Limine under Rules 702 and 704 of the North Carolina Rules of Evidence on October 9, 2007.  The Court heard oral arguments on the motions on November 30, 2007.

# II.

## FACTUAL BACKGROUND

### A.

### THE PARTIES

{4}     Plaintiff Bank of America Corporation ("Bank of America") is a corporation organized under the laws of the State of Delaware having its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.  (Compl. ¶ 2.)

{5}     Plaintiff Banc of America Securities LLC ("Banc") is a Delaware limited liability company with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.  Banc is a wholly-owned, indirect subsidiary of Bank of America. (Compl. ¶ 3.)  Plaintiffs will be referred to collectively as "the Bank."

{6}     Defendant SR International Business Insurance Company, SE ("SRI") is a subsidiary of Swiss Re Insurance Company and is a private limited liability company organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom.  (Compl. ¶ 4.)  SRI is a liability insurance

company engaged in the business of selling insurance contracts to commercial entities in North Carolina and elsewhere. (Compl. ¶ 4.) At the time this suit commenced, SRI was known as SR International Business Insurance Company, Ltd. (Compl.) SRI filed a notice of name change on August 9, 2007, indicating its new name was SR International Insurance Company, Plc. (Def.'s Notice Name Change, Aug. 9, 2007.) SRI filed a subsequent notice of name change on October 26, 2007, indicating its new, and current, name is SR International Business Insurance Company, SE. (Def.'s Notice Name Change, Oct. 26, 2007.)

B.

THE UNDERLYING LITIGATION

{7} The Bank was a defendant in a series of lawsuits arising from the collapse of Enron Corporation ("Enron") and WorldCom, Inc. ("WorldCom"). (Amend. Compl. ¶¶ 14, 19.) The Bank was a defendant in two large class-action lawsuits, one directed to the Enron collapse, *In Re Enron Corporation Securities Litigation, Newby v. Enron Corp.*, Case No. 01-CV-3624 (S.D. Tex.) [hereinafter *Enron Litigation*], and one directed to the WorldCom collapse, *In Re WorldCom Securities Litigation*, File No. 02 CIV.3288 (DLC) (S.D.N.Y.) [hereinafter *WorldCom Litigation*]. (Amend. Compl. ¶¶ 14, 19.) The plaintiffs in both of these lawsuits sought damages of more than $1 billion from the Bank. (Defs.' Answer ¶¶ 16, 21; Pls.' Br. Supp. Mot. Summ. J. 3.) The Bank settled both lawsuits. (Amend. Compl. ¶¶ 17, 23.)

{8} The *WorldCom Litigation* is at issue in this matter.[1] In the *WorldCom Litigation*, the plaintiffs alleged that the Bank caused financial loss to plaintiffs in the commission of its professional services to WorldCom in connection with two bond offerings. (Amend. Compl. ¶ 20.) The Bank served as one of the underwriters for both bond offerings. (Pls.' Br. Supp. Mot. Summ. J. 3; Def.'s Br. Opp'n Summ. J. 2.)

---

[1] Plaintiffs have disavowed any claims against Defendants related to the *Enron Litigation*. (*See e.g.*, Pls.' Br. Opp'n Mot. Partial Summ. J. 6 n.5.) However, the Bank's claim arising out of its settlement of the *Enron Litigation* exhausted its deductible and some of the available coverage under other policies.

{9}     An underwriter under the Securities Act of 1933 is defined as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

15 U.S.C.S. § 77b(a)(11) (LEXIS through 2007 legislation).  Generally, an underwriter "guarantees the sale of newly issued securities by purchasing all or part of the shares for resale to the public."  A DICTIONARY OF BUSINESS LAW TERMS (Bryan A. Garner, ed., 1999) [hereinafter DICTIONARY].  The Bank was a firm-commitment underwriter in the WorldCom offerings.  (Def.'s Br. Opp'n Mot. Summ. J. 7.)  A firm-commitment underwriter is an underwriter that "purchases the securities from the issuer and resells as principal," meaning that any securities not resold are the property of the underwriter.  DICTIONARY.  The lead underwriter communicates first with the issuer to ensure a bond offering will be underwritten.  The lead underwriter organizes the other underwriters into a "syndicate" of which the lead underwriter, sometimes accompanied by other underwriters, acts as the manager in handling all the bond offering details and negotiations.  LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATIONS § 2-A-2 (6th ed. 2006).  The Bank was not the lead underwriter on the bond offerings.[2]  (Def.'s Br. Opp'n Mot. Summ. J. 7, Supplemental App. 121, 415, 452.)

{10}   The Bank was a "Senior Co-Manager" for the 2000 offering. (Def.'s Br. Opp'n Mot. Summ. J. Supplemental App. 415.)  The Bank sold $93,750,000 of the $5 billion bond offering. (Amend. Compl. Tab 6 ¶¶ 54, 99.)

---

[2] Salomon, now Citigroup Global Markets, Inc., was the book runner and co-lead underwriter for the 2000 and 2001 bond offerings.  (Amend. Compl. Tab 6 ¶ 50.)  J.P. Morgan Chase & Co. was the co-lead underwriter for the 2000 bond offering and joint book runner and co-lead underwriter for the 2001 bond offering.  (Amend. Compl. Tab 6 ¶ 53.)  Book runners are the lead underwriters. *Ong v. Sears, Roebuck & Co.*, Fed. Sec. L. Rep. (CCH) P93,524, 2005 U.S. Dist. LEXIS 20391, *7–8 (N.D. IL E.Div. 2005).  Neither Salomon nor J.P. Morgan Chase & Co. are parties in this case.  (Compl.)

{11} The Bank was a "joint lead manager" in the 2001 bond offering. (Amend. Compl. Tab 6 ¶ 54.) The Bank was allocated 11% of the $11.8 billion bond offering. (Def.'s Br. Opp'n Mot. Summ. J. 7; Amend. Compl. Tab 6 ¶¶ 219–20.) The Bank did not sell 11% of the bonds but instead "undertook risk" and earned a fee for 11% of the bonds. (Def.'s Br. Opp'n Mot. Summ. J. Supplemental App. 121.)

{12} The allegations in the *WorldCom Litigation* were that the Bank, and other underwriters, distributed Registration Statements which allegedly contained "material misrepresentations or omissions" and "false statements of material facts." (Pls.' Br. Supp. Mot. Summ. J. Tab 6 ¶¶ 552, 561.) The allegations centered on the underwriters' alleged violations of Section 11 and Section 12 of the Securities Act of 1933, 15 U.S.C.S. §§ 77k, 77*l*(a)(2) (LEXIS through 2007 legislation), in the May 2000 and May 2001 bond offerings for WorldCom. (Pls.' Br. Supp. Mot. Summ. J. Tab 6 ¶¶ 550–70.) Specifically, the *WorldCom Litigation* plaintiffs accused the underwriters of not "mak[ing] a reasonable investigation" as to the validity of the Registration Statements and negligently including false statements and failing to include material facts. (Pls.' Br. Supp. Mot. Summ. J. Tab 6 ¶¶ 552, 561.)

{13} When WorldCom collapsed, the bonds that were underwritten by the Bank were worth significantly less. (Def.'s Br. Opp'n Mot. Summ. J. 2; Amend. Compl. ¶¶ 20–21 (underlying plaintiffs sued for losses incurred from the financial collapse of WorldCom).) The other underwriters were defendants in the *WorldCom Litigation* and were also served with lawsuits similar to the *WorldCom Litigation*. (Pls. Br. Supp. Mot. Summ. J. 4.)

{14} WorldCom's bankruptcy and subsequent collapse occurred in mid- to late 2002. (Pls.' Br. Supp. Mot. Summ. J. 3; Def.'s Br. Opp'n Mot. Summ. J. 2.) The Bank settled the claims against it in the *WorldCom Litigation* for $460.5 million on March 2, 2005. (Pls.' Br. Supp. Mot. Summ. J. 4; Def.'s Br. Supp. Mot. Partial Summ. J. 9.) The other underwriters involved in similar lawsuits also settled their claims. (Pls.' Br. Supp. Mot. Summ. J. 4.) The lead underwriters paid more than the Bank to settle the *WorldCom Litigation*. (Pls.' Br. Supp. Mot. Summ. J. 4, 4 n.6.) The total claims in the *WorldCom Litigation* exceeded $17 billion. (Pls.' Br.

Supp. Mot. Summ. J. 3.) The *WorldCom Litigation* plaintiffs asserted joint and several liability among the underwriters. (Pls.' Br. Supp. Mot. Summ. J. 3.)

C.

THE INSURANCE

{15} The Bank purchased insurance to cover losses that might arise from liability created by their provision of professional services. In this case, the Bank purchased several "layers" of insurance to cover losses related to liability arising from provision of those services. (Amend. Compl. ¶¶ 24, 31–34.) The layers consist of a primary policy, *infra* ¶ 16, and several excess policies, *infra* ¶¶ 20–21. A primary policy includes a retention, the equivalent of a deductible, paid by the Bank (Amend. Compl. ¶ 24) or self-insurance on the part of the Bank (Def.'s Br. Supp. Mot. Partial Summ. J. 2). A first level excess policy provider is liable on the claim amount that is in excess of the primary policy's limit and retention. (Amend. Compl. ¶ 31.) Subsequent level excess policy providers are liable for the claim amount that is in excess of the primary policy's limit, the retention, and the prior level excess insurance policy(ies)'s limit(s). (Amend. Compl. ¶ 32–34.)

{16} The Bank purchased a financial institution professional liability insurance policy ("the Primary Policy") from American International Specialty Lines Insurance Company ("AISLIC"). (Amend. Compl. ¶ 24.) Liability insurance generally is "an agreement to cover a loss resulting from liability to a third party." DICTIONARY. The Primary Policy went into effect prior to the *Enron Litigation* and *WorldCom Litigation*. (*Compare* Amend. Compl. ¶ 24 *with Enron Litigation* (filed October 22, 2001); Def.'s Br. Supp. Mot. Partial Summ. J. 3.) The Primary Policy in pertinent part covers:

> Coverage B-I      Company Insurance
> Subject to the provisions set forth below, this policy shall pay the Loss of the Company in connection with any: (i) Securities Claim(s) first made against the Company, . . . during the Policy Period . . . for any actual or alleged Wrongful Act . . . .

> Coverage B-II      Professional Services Insurance
> This policy shall pay the Loss of the Insureds in connection with any Claim which are first made against any Insured during the Policy Period . . . for any actual or alleged Wrongful Act of any Insured in rendering or failing to render Professional Services and/or the performance of Lending Acts.

(Amend. Compl. App. C 3.)

{17} The Primary Policy defines Loss under Coverage B-I in part as "damages, judgments . . . settlements and Defense Costs." (Amend. Compl. App. C 7.) Loss under Coverage B-II is defined in part as "damages, judgments, settlements and Defense Costs." (Amend. Compl. App. C 7.)

{18} The Primary Policy defines Wrongful Act under Coverage B-I "with respect to the Company, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by Company but only as respects a Securities Claim covered under this policy." (Amend. Compl. App. C 12.) Wrongful Act under Coverage B-II means "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act of any Insured, but only while acting in a covered capacity." (Amend. Compl. App. C 12.) A Securities Claim is defined as a claim arising from the sale or purchase of the insured entity's securities or brought by a security holder of the insured entity. (Amend. Compl. App. C 11.) The *WorldCom Litigation* allegations do not fall under the definition of a Securities Claim but instead allege a Wrongful Act under the Professional Services Insurance coverage.

{19} The Primary Policy also included exclusions to the policy. (Amend. Compl. App. C 13–18.) Those exclusions in pertinent part exclude claims "arising out of, based upon or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled." (Amend. Compl. App. C 13.) The Primary Policy was amended effective March 9, 2002, to also exclude Investment Banking. (Pls.' Br. Supp. Mot. Summ. J. App. Tab 1 at 51.) The Excess Policies continued coverage of Investment Banking by specific endorsement. *Infra*, ¶¶ 20–21.

{20}    The Lloyd's Syndicates provided the first level excess insurance policy to the Bank.  (Amend. Compl. ¶ 31.)  That policy states in pertinent part that it "is subject to the same conditions, limitations and other terms . . . as are contained in or may be added to the Policy(ies) of the Primary Insurer(s)."  (Amend. Compl. App. D Conditions.)  The policy originally stated that "[n]o material amendment or alteration to the Policy(ies) of the Primary Insurer(s) . . . shall be binding hereunder unless and until specifically agreed by the Underwriters hereon."  (Amend. Compl. App. D Conditions.)  The Follow Clause amended the first condition without including the preceding quotation.  (Amend. Compl. App. D Follow Clause.)  However, Endorsement 2, which went into effect March 9, 2002 (the date the Primary Policy was amended to exclude investment banking), reinstated the original first condition with the language regarding amendments to the Primary Policy.  (Amend. Compl. App. D Endorsement 2.)  Endorsement 2 amended the policy to add an Investment Banking Clause in which the Investment Banking exclusion of the Primary Policy was not applicable to the first level excess policy.  (Amend. Compl. App. D Endorsement 2.)

{21}    SRI provided second, third, and fourth level excess insurance policies ("Excess Policies") to the Bank.  (Amend. Compl. ¶¶ 32–34.)  Other insurance carriers subscribed to shares of the Excess Policies.  (Amend. Compl. ¶¶ 32–34; Amend. Compl. App. E–G.)  The Excess Policies state in pertinent part that it "is subject to the same conditions, limitations and other terms . . . as are contained in or may be added to the Policy(ies) of the Primary Insurer(s)."  (Amend. Compl. App. E Conditions.)[3]  The policy originally stated that "[n]o material amendment or alteration to the Policy(ies) of the Primary Insurer(s) . . . shall be binding hereunder unless and until specifically agreed by the Underwriters hereon."  (Amend. Compl. App. E Conditions.)  The Follow Clause amended the first condition without including the preceding quotation.  (Amend. Compl. App. E Follow Clause.)

---

[3] All three excess policies use the same language.  They are called "Follow Form" policies.  In consideration of conciseness, the policy quotations are taken from the second excess policy.  The quotations should be read to apply to the third and fourth excess policies as well.

However, Endorsement 2, which went into effect March 9, 2002 (the date the Primary Policy was amended to exclude investment banking), reinstated the original first condition including the language regarding amendments to the Primary Policy. (Amend. Compl. App. E Endorsement 2.) Endorsement 2 amended the policy to add an Investment Banking Clause in which the Investment Banking exclusion of the Primary Policy was not applicable to the Excess Policies. (Amend. Compl. App. E Endorsement 2.)

{22} The Primary Policy's limit was $25 million. (Amend. Compl. ¶ 24.) The Bank's retention was $50 million. (Amend. Compl. ¶ 24.) The first level excess policy's limit was $50 million. (Amend. Compl. ¶ 31.) The Excess Policies' limits were $50 million, $75 million, and $100 million. (Amend. Compl. ¶¶ 32–34.) SRI carried about one quarter of the liability on the second, third, and fourth level Excess Policies. (Def.'s Br. Opp'n Mot. Summ. J. 12 (stating SRI subscribed to 40% of the second level excess policy, 30% of the third level excess policy, and 17.5% of the fourth level excess policy for a total liability of $60 million, or 27%, of $225 million, with the other 73% subscribed to by eleven additional carriers).)

{23} The Primary Policy is not at issue in the present case. (Amend. Compl. ¶ 25.) The other insurance carriers who subscribed to shares of the Excess Policies are not now party to this suit. (Amend. Compl.) The other Excess Policies' carriers disputed their liability under the settlement of the *WorldCom Litigation*. (Amend. Compl. ¶ 37; Def.'s Br. Opp'n Mot. Summ. J. 1.) Those disputes were settled by the Bank on August 11, 2005. (Pls.' Br. Supp. Mot. Summ. J. App. Tab 35.) The excess policy holders all paid less than the amounts of the coverage of the insurance policies. (*Compare* Amend. Compl. App. D–G *with* Pls.' Br. Supp. Mot. Summ. J. App. Tab 35 Section 1.) The settlement included a most favored nation clause stipulating that if the Bank settled with any Non-Participating Insurer(s), the terms of the settlement would be "amended to conform to the more favorable monetary consideration . . . between [the Bank] and any Non-Participating Insurer(s)." (Pls.' Br. Supp. Mot. Summ. J. App. Tab 35 Section 7.) SRI is a "Non-Participating Insurer." (Pls.' Br. Supp. Mot. Summ. J. App. Tab 35 at 1 (listing the

insurance companies party to the settlement agreement, SRI is not included).) SRI's liability on the Excess Policies is at issue in the present case. (Amend. Compl. ¶ 1.) The other eleven carriers have settled any disputes and liabilities with the Bank. (Pls.' Br. Opp'n Mot. Partial Summ. J. 11.) In short, any Bank settlement with SRI that is more favorable than the prior settlements will result in an adjustment of the prior settlements unfavorable to the Bank. As one of the first underwriters to settle in the underlying *WorldCom Litigation*, the Bank had the benefit of a most favored nation clause in its settlement. One factor distinguishing SRI's position from that of the other excess carriers is its claim for misrepresentation discussed below. *Infra*, ¶¶ 65–66.

D.

THE TIMELINE OF INSURANCE AND LITIGATION

{24} The exact timeline of events is in dispute. Several undisputed events can be stated. The first complaint and summons in the *Enron Litigation* were received on December 14, 2001. (Def.'s Amend. Answer and Counterclaims ¶ 186.) The *WorldCom Litigation* consolidated action commenced in October 2002.[4] (Pl.'s Br. Supp. Mot. Summ. J. Tab 6 ¶ 13 (providing date of original complaint).) The original effective dates of the Primary Policy were September 30, 2001 through September 30, 2002. (Pl.'s Br. Supp. Mot. Summ. J. App. C.) The Excess Policies' original effective dates were September 30, 2001 through September 30, 2002. (Pl.'s Br. Supp. Mot. Summ. J. Apps. D–G.) All effective dates were amended to end on June 30, 2002. (Pls.' Br. Supp. Mot. Summ. J. App. Tab 1 at 51; Amend. Compl. App. D–G Endorsement 3.) The Bank gave SRI notice that there could be a claim arising from its underwriting services in WorldCom bond offerings on June 28, 2002, two days before the expiration period. (Def.'s Amend. Answer and Counterclaims ¶ 221.) The Bank tendered a claim for the settlement and defense

---

[4] The first WorldCom-related lawsuit noted by the Bank was filed June 28, 2002. (Amend. Compl. App. B.) Judge Cote notes that the first WorldCom-related lawsuit filed in her district was filed April 2002. *In re WorldCom Sec. Litig.*, 2007 U.S. Dist. LEXIS 48155 at *3 (S.D.N.Y. 2007).

costs associated with the *WorldCom Litigation* to SRI on September 28, 2005. (Def.'s Br. Supp. Mot. Partial Summ. J. 10.)

{25}   SRI renewed the Excess Policies in June 2002, June 2003, and June 2004. (Def.'s Br. Supp. Mot. Partial Summ. J. 4.)  SRI was informed of the possible *WorldCom Litigation* claims two days before the 2002–03 policy was to take effect. (Pls.' Br. Opp'n Mot. Partial Summ. J. App. Tab 25 ¶ 4.)  When SRI renewed in June 2002, it requested an additional premium of $1 million in consideration of the possible loss in 2001 from the *WorldCom Litigation*.  (Pls.' Br. Opp'n Mot. Partial Summ. J. App. Tab 26 Ex. 1.)  SRI did not receive the additional $1 million premium and renewed with a supplemental premium endorsement.  (Pls.' Br. Opp'n Mot. Partial Summ. J. App. Tab 26 Ex. 1.)  The supplemental premium endorsement created an additional premium payable to insurers in the 2001 program who made claim payments.  (Pls.' Br. Opp'n Mot. Partial Summ. J. App. Tab 25 ¶ 5.)  SRI created a special unit sometime in 2003 to handle investment banking claims such as the WorldCom claims.  (Pls.' Br. Opp'n Mot. Partial Summ. J. 6.)  Mr. Richard Murray led the special unit.  (Pls.' Br. Opp'n Mot. Partial Summ. J. 7.)

{26}   Prior to SRI agreeing to subscribe to the Excess Policies, the Bank's Chief Financial Officer, Mr. James Hance, signed a Warranty Statement on October 1, 2001.  (Def.'s Br. Opp'n Mot. Summ. J. 2.)  Mr. Hance consulted with Messrs. Schieferdecker, Director of Corporate Insurance for the Bank, and Polking, General Counsel for the Bank.  (Def.'s Br. Opp'n Mot. Summ. J. 10.)  Mr. Schieferdecker had conducted "due diligence" prior to their conversation to determine what information would need to be disclosed.  (Def.'s Br. Opp'n Mot. Summ. J. 10–11.)  The Warranty Statement said in part that "no person proposed for coverage is aware of any fact or circumstance or any actual or alleged act, error, or omission which he or she has reason to suppose might give rise to a future claim that would fall within the scope of the proposed coverage."  (Def.'s Br. Opp'n Mot. Summ. J. 10.)  The scope of the proposed coverage was $250 million.  (Pls.' Br. Supp. Mot. Summ. J. 26.)  The Warranty Statement was prepared on the request of an insurer other than SRI.

(Pls.' Br. Supp. Mot. Summ. J. 26.)  The insurer sent the Warranty Statement to Marsh, Inc. ("Marsh") in late September 2001.[5]   (Pls.' Br. Supp. Mot. Summ. J. 26.) The parties disagreed on other matters related to the Warranty Statement.  *See infra*, ¶ 30.

{27}   During the pendency of the insurance policies at issue and before March 2002, the Bank settled a shareholder suit referred to as the D.E. Shaw litigation ("Shaw Litigation").  (Amend. Compl. ¶ 29.)  The Shaw Litigation was a claim under a prior insurance policy with AISLIC for which SRI provided no coverage and did not participate.  (Def.'s Br. Opp'n Mot. Summ. J. 5.)  The February 2002 settlement of the Shaw Litigation stipulated that the Bank amend its insurance coverage to reflect changes in the Primary Policy.  (Amend. Compl. ¶ 29.)  As part of the Shaw Litigation settlement, the Bank entered into an Insurance Settlement Agreement ("ISA") with AISLIC, which opened negotiations for amendments of the then-current insurance program at issue here.  (Pls.' Br. Supp. Mot. Summ. J. 8.)  The amendment, Endorsement 17, excluded investment banking from the Primary Policy's coverage as of March 9, 2002.  (Pls.' Br. Supp. Mot. Summ. J. App. Tab 1 at 51.)  That amendment would have affected the Excess Policies as well by excluding investment banking from those policies since they were follow form policies.  (Pls.' Br. Supp. Mot. Summ. J. 9, Tab 3 (Follow Clause); Pls.' Br. Opp'n Mot. Partial Summ. J. 8.)  AISLIC also received a substantial premium increase for itself of $3 million.  (Pls.' Br. Supp. Mot. Summ. J. Tab 1 Endorsement 20.)  However, SRI agreed to continue coverage unchanged as did the other excess carriers.[6]  (Def.'s Br. Opp'n Mot. Summ. J. 2–3.)  SRI signed the endorsement to continue coverage on

---

[5] Marsh is Plaintiffs' insurance broker.  An insurance broker is "[o]ne who sells insurance policies without an exclusive affiliation with a particular insurance company.  DICTIONARY.  Marsh is "the world's leading insurance broker," helping companies "transform risk from a liability into an advantage."  Marsh–About Marsh, http://global.marsh.com/about/index.php (last visited Dec. 10, 2007).  Marsh is not a party to this suit.  (Compl.)

[6] Some of the carriers had provided coverage on the prior policy and thus knew the details of the Shaw Litigation settlement and the ISA.  SRI was not in that same position.  SRI signed the endorsement to continue coverage on March 1, 2002.  (Def.'s Br. Opp'n Mot. Summ. J. 22–23.)

March 1, 2002. (Def.'s Br. Opp'n Mot. Summ. J. 22–23.) The circumstances surrounding that agreement are at issue here.

{28} The Bank settled the *WorldCom Litigation* on March 2, 2005, and announced the settlement on March 3, 2005. (Pls.' Br. Supp. Mot. Summ. J. 4.) SRI initiated a declaratory judgment action against the Bank in New York on March 3, 2005. (Def.'s Amend. Answer and Counterclaims ¶ 79.) SRI contacted the Bank the same day to express expectation to continue negotiations. (Def.'s Br. Supp. Mot. Partial Summ. J. 9.) The Bank filed the current action in North Carolina on March 23, 2005. (Compl.) The action in New York was dismissed in favor of the current action on July 14, 2005. (Def.'s Amend. Answer and Counterclaims ¶ 79; Amend. Compl. ¶ 45.) The Bank settled disputes with the other excess policy holders on August 11, 2005. (Pls.' Br. Supp. Mot. Summ. J. App. Tab 35.) SRI settled coverage disputes with other insured investment banks over their WorldCom claims in 2005 and 2006 without acknowledging liability. (Def.'s Br. Supp. Mot. Partial Summ. J. 17–18.) SRI and the other insured investment banks settled at a discount of the coverage. (Def.'s Br. Supp. Mot. Partial Summ. J. 17–18.)

E.

DISPUTED FACTS

{29} The parties disagree as to what occurred before SRI subscribed to the Excess Policies. There was a disagreement over whether the Bank would provide written answers to questions. (Def.'s Br. Opp'n Mot. Summ. J. 8.) SRI contends that the London Market standard of disclosure of information by the broker applies to the communications between the Bank, Marsh, and SRI prior to subscription to the Excess Policies. (Def.'s Br. Opp'n Mot. Summ. J. 31–34.) The Bank contends that the London Market standard does not apply in the current situation. (Pls.' Reply Supp. Mot. Summ. J. 8–9.) The parties also disagree as to what the London Market standards are. (*Compare* Def.'s Br. Opp'n Mot. Summ. J. 32 ("The broker must disclose all material information related to the risk, as the underwriter strictly relies on the broker to do so.") *with* Pls.' Reply Supp. Mot. Summ. J. 8 ("[T]he Bank's expert witness clearly testified to the common sense notion that, in

the London insurance market and elsewhere, only an underwriter knows what he believes is material . . . .").)

{30} Mr. Hance signed a Warranty Statement before SRI subscribed to the Excess Policies. *See supra* ¶ 26. The parties disagree as to whether the Warranty Statement was true. (*Compare* Def.'s Br. Opp'n Mot. Summ. J. 4 ("There is substantial evidence that the Bank had concerns about WorldCom and its exposure to WorldCom at the time that the Bank signed the Warranty Statement.") *with* Pls.' Br. Supp. Mot. Summ. J. 15 ("[T]he record shows that no person at the Bank knew the Bank was facing a $250 million potential liability as a result of the underwriting of the WorldCom bonds.").) The parties disagree as to whether the Warranty Statement applies to the Excess Policies. (*Compare* Def.'s Br. Opp'n Mot. Summ. J. 10 ("The Bank understood that all of the prospective insurers wanted the Warranty Statement, and that it applied to all layers of coverage.") *with* Pls.' Reply Supp. Mot. Summ. J. 3 n.2 ("As recognized by SRI's underwriter, the Statement, by its own terms, only applied to the top layer of excess coverage.").) There is a dispute about whether SRI saw the Warranty Statement before agreeing to continue coverage. (*Compare* Pls.' Mot. Summ. J. 27 ("There is no evidence that anyone at SRI even saw the signed statement before SRI agreed to participate as an insurer on the Bank's 2001-02 program.") *with* Def.'s Br. Opp'n Mot. Summ. J. 38–39 (there is no contradiction to the statement that SRI did not see the Warranty Statement before agreeing to provide insurance to the Bank).) Despite the disagreement, the Court has determined as a part of this Order that the Warranty Statement did not provide an exclusion on the facts in this record.

{31} The matter of SRI's decision to continue coverage unchanged is also a point of dispute between the parties. The above-referenced ISA stipulated that "BankAmerica [would] be free to renegotiate with any and all other carriers, including AISLIC and following form excess carriers" for a limited amount of time after the Primary Policy became effective. (Pls.' Br. Supp. Mot. Summ. J. Tab 34 at 3.) The parties disagree as to whether this statement gave both the Bank and insurance policy holders the right to renegotiate the Excess Policies or only the

Bank. (*Compare* Unofficial Tr. 34, Nov. 30, 2007 ("[The ISA] gives Bank of America the right to renegotiate. It doesn't say a thing about absent excess carriers having the right to renegotiate.") *with* Unofficial Tr. 58, Nov. 30, 2007 ("[T]he ISA, that says all the other carriers can renegotiate.").) The parties disagree as to whether SRI had any rights under the ISA. (*Compare* Def.'s Br. Opp'n Mot. Summ. J. 2 ("The ISA provided that every insurer on the Bank's *current* Policies (the policies at issue in this case) could renegotiate or cancel its coverage." (emphasis in original)) *with* Pls.' Br. Supp. Mot. Summ. J. 39 ("[T]he ISA does not give SRI the right to renegotiate or cancel its participation on the Bank's 2001-02 insurance program.").) The Parties disagree whether the change to the Primary Policy effectuated by the ISA gave SRI the right to renegotiate separate from the language of the ISA. (*Compare* Pls.' Br. Supp. Mot. Summ. J. 39 ("[A]ny rights SRI had to renegotiate its coverage position flowed from (a) the changes in the AISLIC Primary Policy . . . and (b) the 'maintenance of underlying insurance' clauses in the Excess Policies . . . ." *with* Unofficial Tr. 59, Nov. 30, 2007, (". . . if you just had [AISLIC] coming off the coverage, or coming off part of the coverage like the investment banking coverage, it's really unclear what rights would have existed to renegotiate, and on what basis.").)

{32} Mr. Andrew Calder of Marsh visited Limit, one of the Lloyd's Syndicates holding the first level excess policy, to request that Limit continue coverage after the ISA was signed. (Pls.' Br. Supp. Mot. Summ. J. 10.) Mr. Calder wrote a letter to Limit stating inaccurately that Limit would not be able to cancel coverage under the ISA. (Pls.' Br. Supp. Mot. Summ. J. 11; Def.'s Br. Opp'n Mot. Summ. J. 3.) The Bank contends that Limit knew the letter was inaccurate, but requested it "for the file." (Unofficial Tr. 95, Nov. 30, 2007.) SRI agrees that Limit requested the inaccurate letter. (Unofficial Tr. 50, Nov. 30, 2007.) The parties disagree as to the effect of that letter on Limit's endorsement. (*Compare* Unofficial Tr. 40, Nov. 30, 2007 (pointing out that Limit agreed to continue coverage on February 28 but did not see the inaccurate letter until March 4) *with* Unofficial Tr. 50–51, Nov. 30, 2007 (contending the "sub letter" notation found in Limit's endorsement on February 28

refers to Mr. Calder's letter, without which the endorsement would not have been valid).) In any event, Limit had been advised by its own counsel that it could decline to continue coverage. (Pls.' Br. Supp. Mot. Summ. J. 36–37.) Mr. Calder was disciplined by Marsh for writing the letter to Limit because it contained a statement he knew was not true. (Def.'s Br. Opp'n Mot. Summ. J. 22.)

{33} Mr. Calder also went to SRI to discuss continuing coverage during the time he was having similar discussions with Limit. (Pls.' Br. Supp. Mot. Summ. J. 8; Def.'s Br. Opp'n Mot. Summ. J. 2–3.) The parties disagree as to the content of those discussions. (*Compare* Pls.' Br. Supp. Mot. Summ. J. 9 ("Marsh told SRI . . . about the existence of the ISA, the impending changes to the AISLIC Primary Policy . . . .") *with* Def.'s Br. Opp'n Mot. Summ. J. 3 ("*After* SRI had committed to remain on coverage on March 1, 2002, it learned for the first time that (1) the ISA existed . . . ." (emphasis in original).) SRI claims that the first conversation it had with Mr. Calder regarding the ISA occurred shortly after SRI committed to remaining on the coverage. (Def.'s Br. Opp'n Mot. Summ. J. 3.) SRI alleges that when Mr. Calder told SRI that the ISA was a "private agreement" to which SRI was not privy, he was lying. (Def.'s Br. Opp'n Mot. Summ. J. 3.) The Bank accepts that Mr. Calder called the ISA a private agreement, but argues that was a true statement and that the agreement gave the Bank the right to show or not to show the ISA as it chose. (Unofficial Tr. 30–31, Nov. 30, 2007.)

{34} The parties also disagree as to the effect the letter Mr. Calder sent to Limit had on SRI's decision to continue coverage. SRI claims that Limit's and the other excess policy holders' continuing coverage was a prerequisite for SRI to continue coverage. (Def.'s Br. Opp'n Mot. Summ. J. 3, 18–19.) The Bank claims that there was no such prerequisite in place. (Pls.' Reply Supp. Mot. Summ. J. 10.) There are numerous factual disputes surrounding SRI's March 1, 2002 endorsement of the policies. As discussed herein, those disputes prevent summary judgment on the fraud, misrepresentation, rescission, and unfair trade practice claims asserted in the Amended Answer and Counterclaims.

## III.

## LEGAL STANDARD

{35}   The Bank and SRI have filed motions for summary judgment.  The Bank requests the Court grant summary judgment on Counts III and IV of the Amended Complaint.  (Pls.' Mot. Summ. J. 1.)  The Bank requests the Court grant summary judgment and dismiss SRI's Counterclaim Counts I – IV and Counts IX – XI of the Amended Counterclaim.  (Pls.' Mot. Summ. J. 2.)  The Bank requests the Court hold that the losses it incurred from the *WorldCom Litigation* are covered under SRI's insurance policies and that neither the exclusions of the insurance policies nor the affirmative defenses found in SRI's Amended Answer bar coverage.  (Pls.' Mot. Summ. J. 1–2.)  SRI requests the Court grant summary judgment and dismiss Count VI of Plaintiffs' Amended Complaint (Bad Faith).  (Def.'s Mot. Partial Summ. J. 1.)

{36}   Count III of the Amended Complaint alleges breach of contract against SRI for refusal to pay defense costs related to the *WorldCom Litigation*.  (Amend. Compl. 18.)  Count IV of the Amended Complaint requests declaratory judgment against SRI regarding its obligations arising from the *WorldCom Litigation*.  (Amend. Compl. 18.)  Count I of the Counterclaims requests a declaration that the Bank's claims related to the *WorldCom Litigation* are uninsurable as a matter of law.  (Answer 41.)  Count II of the Counterclaims requests a declaration that the Bank's claims arising from the *WorldCom Litigation* are excluded.  (Answer 43.)  Count III of the Counterclaims requests a declaration that the Bank's claims arising from the *WorldCom Litigation* are in connection with the Bank's gain of personal profit or advantage to which the Bank was not legally entitled.[7]  (Answer 45.)  Count IV of the Counterclaims requests a declaration that the Bank did not provide SRI with sufficient information of the *WorldCom Litigation* settlement for it to make an informed decision as to the reasonableness of the settlement.  (Answer 46.)

---

[7] The Excess Policies exclude coverage for losses "arising out of, based upon, or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled." (Amend. Compl. App. C 13.)  Count III therefore asks the Court to find that exclusion 5(a) of the Primary Policy applies to the claims under the *WorldCom Litigation*.

Count IX of the Amended Counterclaims alleges the Bank committed fraud on SRI through its agent Marsh. (Amend. Answer and Counterclaims ¶¶ 224–30.) Count X of the Amended Counterclaims alleges the Bank through its agent Marsh misrepresented or omitted material facts to SRI. (Amend. Answer and Counterclaims ¶¶ 231–35.) Count XI of the Amended Counterclaims alleges that the Bank engaged in unfair and deceptive trade practices in violation of North Carolina General Statute § 75.1-1 (2005). (Amend. Answer and Counterclaims ¶¶ 236–39.) These claims are interrelated and related to the Bank's request for summary judgment as to SRI's affirmative defenses.

{37} Count VI of the Amended Complaint alleges SRI's denial of the Bank's claims was in bad faith.

{38} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C. R. Civ. P. 56 cmt. The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The Court must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

IV.

SUMMARY OF OPINION

{39} The following is a summary of the Court's decision. The Court grants the Bank's motion for summary judgment on its breach of contract claim against SRI subject to SRI's defense of rescission based upon alleged misrepresentations or

omissions of material fact asserted by SRI. The Bank is entitled as a matter of law to judgment that the amounts the Bank paid to settle the claim against it in the securities class action lawsuits involving WorldCom are "losses," as defined in its liability insurance policy covering investment banking activities. As a part of that decision, the Court has concluded that the Bank is entitled to judgment as a matter of law that its settlement was reasonable. While SRI has asserted that the settlement was not reasonable, it has adduced no proof to support its position. The Bank has produced an abundance of evidence that the settlement was reasonable. The Court finds as a matter of law that no rational jury could find that the settlement was not reasonable under the circumstances.

{40} In granting the Bank's motion, the Court has rejected SRI's argument that treating payments made to settle causes of action asserted against investment bankers under Sections 11 and 12 of the Securities Act of 1933 would constitute bad public policy and thus be prohibited under North Carolina law. The North Carolina courts have not previously engrafted — and this Court believes they will not engraft — upon this insurance policy an exclusion which could have been included by the insurer but was not. The Court believes the claims which were settled by the Bank in the underlying class action lawsuits are not similar to the claims in the line of cases cited by SRI to support its argument.

{41} The Court has reviewed but rejected Professor Priest's arguments with respect to economic policy. The Court's decision with respect to the definition of losses under the policy renders Professor Priest's testimony moot. The Court would exclude his testimony in any event on the simple grounds that it would invade the province of the jury and constitute a direction to them as to what public policy ought to be — a function reserved for the courts and the legislature.

{42} SRI is entitled to summary judgment on the Bank's bad faith claim. As appears more fully below, there exist material issues of fact to be determined by the jury with respect to SRI's claim for rescission. The fact that the rescission claim is triable and thus not strained or fanciful would defeat the bad faith claim. SRI's argument for a change in the law with respect to public policy governing losses from

investment banking are made somewhat palatable by the changed and charged environment since the WorldCom and Enron debacles. While the Court has found the arguments to be without merit, it is not prepared to say they were strained or fanciful given the huge settlements reached by investment banks in those cases and the allegations of complicity of outsiders in the frauds perpetrated by corporate management. Certainly, insurers were within their rights to ask questions concerning the relationship between their insureds and those accused of fraud. Similarly, they were within their rights to wait and see not only what discovery in the underlying actions showed with respect to the conduct of the insureds but also what legal theories would be applied by the federal courts deciding issues of law for which little precedent existed. Nor does the filing of a summons in state court in New York constitute bad faith under the circumstances. The circumstances surrounding the Bank's claims will be more fully discussed below.

{43} The motions for summary judgment concern Counts III (breach of contract), IV (declaratory judgment), and VI (bad faith) of the Amended Complaint and Counts I (uninsurable), II and III (excluded), IV (not sufficient information), IX (fraud), X (misrepresentation), and XI (unfair and deceptive trade practices) of the Counterclaims and Amended Counterclaims. Counts I, II, III, and IV of the Counterclaims are related to SRI's defenses against Counts III and IV. The Court will address these claims simultaneously with the defenses asserted in the Answer and Amended Answer. The Court will then address Counts IX, X, and XI of the Amended Counterclaims and Count VI of the Amended Complaint.

V.

ANALYSIS

A.

AMENDED COMPLAINT COUNTS III AND IV:  BREACH OF CONTRACT AND
DECLARATORY JUDGMENT ON OBLIGATION TO PAY

1.

DEFENSE TO COUNTS III AND IV:  NO LOSSES

COUNTERCLAIM COUNT I:  UNINSURABLE AS A MATTER OF LAW

{44}   There is no question that the policies issued by SRI covered the losses
sustained by the Bank in settlement of the WorldCom class action lawsuits. The
policy language is clear and unequivocal.  The Excess Policies were "follow form"
policies.  As such, the terms of the underlying AISLIC policy and the Excess Policies
control.  Together they provide that the

> term "Loss" means damages, judgments, settlements and Defense
> Costs; however, Loss shall not include: (i) civil or criminal fines
> imposed by law, (ii) punitive or exemplary damages; (iii) the multiplied
> portion of multiplied damages; (iv) taxes; (v) any amount for which the
> Insureds are not financially liable or which are without legal recourse
> to the Insureds; or (vi) matters which may be deemed uninsurable
> under the law pursuant to which this policy shall be construed

(Amend. Compl. App. C 7) and that the Insurers "shall pay the Loss of the Insureds
in connection with any Claim which are first made against any Insured during the
Policy Period . . . for any actual or alleged Wrongful Act of any Insured in rendering
or failing to render Professional Services" (Amend. Compl. App. C 3).

{45}   The language of the policy and the undisputed facts recited above establish
the Bank's claim for coverage.  The basic elements of the policies insuring
agreements have been met.  The Bank has sustained a loss in connection with a
claim first made against it for an actual or alleged wrongful act in rendering
professional services.

{46}   The claim was made during the policy period.  There can be no doubt that
the WorldCom class action lawsuit was a judicial proceeding initiated against the

Bank (a "claim") which alleged breaches of duty, neglect, error, and misstatement (a "wrongful act") in connection with services rendered on or before the initiation of the policies for others for a fee or under contract ("professional services"). There is no dispute in this record that SRI knew it was insuring the kind of investment banking activities that the Bank performed for WorldCom and others. It had specifically agreed to stay on that coverage despite the withdrawal of AISLIC coverage for that activity under the underlying policy. The definition of "loss" in the policies clearly covers "settlements and Defense Costs." (Amend. Compl. App. C 8.)

{47}   SRI makes the argument that the Bank has not suffered a loss. It argues that the term loss does not include "matters which may be deemed uninsurable under the law pursuant to which the policy shall be construed." (Def.'s Br. Opp'n Mot. Summ. J. 42.) Its position is based upon the premise that the public policy of North Carolina would not permit insurance coverage of claims made under Sections 11 and 12 of the Securities Act of 1933. That position is without merit for a number of reasons.

{48}   First, as SRI acknowledges, there exists neither statutory authority nor judicial decision in North Carolina holding that claims under Section 11 are uninsurable. Applying generally recognized rules of construction, which hold that limitations on coverage are to be narrowly construed against the insurer, would seem to end the inquiry there.[8] It is unlikely that the appellate courts of this State would relieve an insurer of liability for claims arising out of coverage that the insurer actively sought to write based on an argument by the insurer that it was bad public policy for the insurer to write that coverage.

{49}   Second, and more importantly, SRI's argument that this Court should find that the North Carolina appellate courts will adopt a public policy making the

---

[8] The Court notes for the record that the other insurers involved in the coverage of the Bank have paid all or a substantial portion of the claims asserted by the Bank for Section 11 losses. See Settlement Agreements at Tabs 35–36 of the Bank's Appendix of Record Evidence. While there was no acknowledgement of liability on the part of the insurers, the size of the settlements is indicative of the belief that it was unlikely that any exclusion would exist for Section 11 claims. Also, AISLIC paid the full amount of its coverage for the Section 11 claims asserted against the Bank in the *Enron Litigation* case. SRI has paid other insureds for Section 11 claims arising out of the same litigation although the policy limits may not have been paid and liability may not have been admitted.

Section 11 claims in this case uninsurable is not supported by the cases SRI relies upon. Both *Level 3 Communications, Inc. v. Federal Insurance Co.*, 272 F.3d 908 (7th Cir. 2001), and *CNL Hotels Y Resorts, Inc. v. Houston Casualty Co.*, 505 F. Supp. 2d 1317, 2007 U.S. Dist. LEXIS 17904 (M.D.F.L. 2007), are clearly distinguishable from the case at issue and contain language which would indicate that even those courts would not find the claims here uninsurable. In each case, the insured was an issuer of securities and had been the recipient of money from the plaintiffs in the underlying action giving rise to the settlement for which coverage was claimed. *Level 3 Commc'ns, Inc.*, 272 F.3d at 909; *CNL Hotels Y Resorts, Inc.*, 505 F. Supp. 2d ___, 2007 U.S. Dist. LEXIS at *2–3. In each case, the court held that "loss" within the meaning of an insurance contract does not include the restoration of an ill-gotten gain. *Level 3 Commc'ns, Inc.*, 272 F.3d at 910; *CNL Hotels Y Resorts, Inc.*, 505 F. Supp. 2d ___, 2007 U.S. Dist. LEXIS at *21. In case cases, the insured had settled a case seeking damages in the nature of restitution. *Level 3 Commc'ns, Inc.*, 272 F.3d at 909–10; *CNL Hotels Y Resorts, Inc.*, 505 F. Supp. 2d ___, 2007 U.S. Dist. LEXIS at *2–3. In both cases, the plaintiffs in the underlying securities case were seeking to recover the gain the issuer (insured) had received from its own officers' misbehavior. *Level 3 Commc'ns, Inc.*, 272 F.3d at 910; *CNL Hotels Y Resorts, Inc.*, 505 F. Supp. 2d ___, 2007 U.S. Dist. LEXIS at *2–4. The damages claimed in the *WorldCom Litigation* were different. The investment bankers were not issuers and did not receive the proceeds of the bond offerings. Under the theory of *Level 3* and *CNL*, if WorldCom had been the insured in this case it would not have suffered a loss because it would be providing restitution of funds that it had received. Judge Posner used the analogy of a constructive trust to recover stolen property to describe the remedy sought in the underlying class action in *Level 3*. *Level 3 Commc'ns, Inc.*, 272 F.3d at 911. No similar claims appear here. Judge Posner expressly recognized that there could be some Section 11 claims that did result in loss. *Id. See also*, *CNL Hotels Y Resorts, Inc.*, 505 F. Supp. 2d ___, 2007 U.S. Dist. LEXIS at *19–20 (noting that *Level 3* gave examples of "loss" which would be covered and finding that the holding was

not limited to Section 10(b) claims). In the *CNL* case, Judge Presnell likewise focused on the restitutionary character of the damages claimed in the underlying action. *CNL*, 505 F. Supp. 2d. at ___, 2007 U.S. Dist. LEXIS at \*19–20. He said, "[t]he important point in the *Level 3* case was that the amount obtained by the plaintiffs in the underlying suit 'was part of Level 3's gain from its officers' misbehavior.'" *Id.* (citing *Level 3 Commc'ns, Inc.*, 272 F.3d at 911).

{50} A careful review of the underlying complaint in the *WorldCom Litigation* discloses no claim that seeks damages of a restitutionary nature against the investment banks. The damages sought were for losses resulting from negligent performance of the underwriters' duties. The *WorldCom Litigation* plaintiffs did not seek to force the investment banks to return money which they had received and to which they were not entitled. Citing *Level 3*, Judge Presnell held that "[i]n a Section 11 case, if an entity makes a payment that constitutes something other than disgorgement of its own ill-gotten gains, it has suffered a loss." *Id.* at ___, 2007 U.S. Dist. LEXIS at \*22.

{51} SRI's efforts to shoe-horn its way under the *Level 3* doctrine are unavailing. Even if, as SRI argues, the Bank had loans from WorldCom paid down as a result of the receipt of bond proceeds from the underwritten offering, those were not sums which were sued for in the underlying action or were ill-gotten or stolen. Those sums constituted the repayment of legitimate debt. Nor is there any substantial evidence that such repayment is what actually happened. In addition, the extension of the law espoused by SRI is not practical in the real world. Many banks act as underwriters for customers with whom they do other business. The practical effect of SRI's position would be to call into question any insurance coverage where an underwriter did any other business with the issuer.

2.

DEFENSE TO COUNTS III AND IV: RESCISSION AND CLAIM EXCLUSIONS
COUNTERCLAIM COUNTS II AND III: CLAIM EXCLUSIONS APPLY

{52} The Bank having established a claim under the language of the policy, the burden then shifts to SRI to show that some exclusion under the policy applies or

that it is entitled to rescission as claimed in its defense and counterclaim. *Allstate Ins. Co. v. Lahoud*, 167 N.C. App. 205, 605 S.E.2d 180 (2004). SRI has made two arguments for exclusion under the policy. The Bank is entitled to summary judgment on both.

{53} First, SRI contends that the exclusion for loss related to "[c]laims . . . arising out of, based upon, or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled" applies to the Bank. There are no facts of record which prove that the Bank received anything to which it was not legally entitled. It was legally entitled to fees for its underwriting services. If there were evidence to show that the Bank received repayment of loans from WorldCom from the proceeds of the underwriting — evidence the Court finds lacking — such repayments have not been shown to be illegal in any manner. Nor is the loss for which the claim was filed attributable to any personal profit or advantage. While SRI would like to think that the Bank participated in some large conspiracy with WorldCom and others to defraud investors in WorldCom bonds, it has not been able to adduce proof of such conspiracy. The underlying claim here is based upon alleged liability for negligent performance of duties as an underwriter. The Bank has not profited from such action. It has paid hundreds of millions of dollars of its own money as a result of its actions. The Court believes that the interpretation of this exclusion adopted by the court in *Nicholls v. Zurich American Insurance Group*, 244 F. Supp. 2d 1144 (D. Colo. 2003), is the correct limited interpretation. That court held that "the reasons for [the personal profit] exclusion are equally clear — to prevent the looting of corporate assets by directors and officers and then, after being forced to remit the funds, turning to an insurer seeking indemnification for their wrongful acts . . . ." *Id.* at 1160.

{54} Second, SRI contends that the Warranty Statement signed by the Bank's chief financial officer, Mr. Hance, bars coverage. The statement stated that "no person proposed for coverage is aware of any fact or circumstance or any actual or alleged act, error, or omission which he or she has reason to suppose might give rise to a future claim that would fall within the scope of the proposed coverage."

{55} An insurer other than SRI asked for the statement, but it was delivered to Marsh, the broker. There is an issue of fact concerning whether SRI saw the statement before agreeing to the policies and whether or not it was actually a part of the policies. Those disputes do not foreclose summary judgment because the Court finds that there is no evidence that anyone covered by the policy had the requisite knowledge to trigger the exclusion.

{56} The parties disagree over the test to be applied to the statement. The Bank contends that it is a subjective test: i.e., the truth of the statement is to be judged by the signor's subjective belief. The Bank cites *Citizens Bank of Jonesboro, Arkansas v. Western Employers Insurance Co.,* 865 F.2d 964 (8th Cir. 1989), and *Liebling v. Garden State Indemnity*, 337 N.J. Super. 447, 767 A.2d 515 (N.J. Super. 2001), to support its position. SRI contends that the test is objective and cites two Illinois cases, *Ratcliffe v. International Surplus Lines Insurance Co.*, 550 N.E. 2d 1052 (Ill. Ct. App 1990), and *Evanston Insurance Co. v. Security Assurance Co.*, 715 F. App. 1405 (N.D. Ill. 1989), to support its position. It also points out that the *Liebling* court acknowledged that other states employed different tests. There are no North Carolina cases on point. The Court believes that under the circumstances of this case the North Carolina courts would apply a subjective test. This case involves an enormous institution. The Bank went to its highest ranking financial officer to get the statement signed. If anyone would know of a potential claim in a magnitude of $250 million, it would be the chief financial officer. Mr. Hance testified under oath that he had no knowledge of a potential claim or facts and circumstances which he believed would give rise to a claim in excess of $250 million. (Pls.' Br. Supp. Mot. Summ. J. App. 16.) There is nothing in the record to contradict his testimony that that was his subjective belief as of October 1, 2001, the effective date of the warranty. The Bank was not even the lead underwriter of the 2001 WorldCom bond offerings. The test which SRI proposes would be a 20-20 hindsight view of what the Bank, having accumulated all of the knowledge in its various businesses, should have guessed would happen. This warranty request seems clearly designed on its face to require someone at the highest levels of the Bank to

assure that there were no hidden claims of which the Bank was aware and that the person signing the statement did not believe that any circumstances existed which would give rise to such a claim.

{57}   SRI further contends that the exclusion would apply if any person who was covered — not just Mr. Hance — had knowledge of a claim. (Def.'s Br. Opp'n Mot. Summ. J. 38.) However, SRI points to no covered individual whom it believes either had knowledge of so large a claim arising out of the bond offering or thought that one might exist. Even if this were an objective test, SRI's effort to show that Mr. Hance or the Bank collectively knew that facts or circumstances existed that would give rise to an enormous claim against the Bank falls short of the mark. Discovery in this case has been broad and extensive. All SRI has shown is that loan officers at the Bank were concerned about WorldCom's financial condition and had downgraded its risk rating internally. (Def.'s Br. Opp'n Mot. Summ. J. 6–7.) At least one Bank employee believed that WorldCom's accounting was aggressive. (Def.'s Br. Opp'n Mot. Summ. J. 9–10.) The Bank was concerned about Mr. Ebbers' personal financial condition. (Def.'s Br. Opp'n Mot. Summ. J. 5–6.) Mr. Ebbers' was WorldCom's CEO during the financial troubles that lead to WorldCom's downfall. (Def.'s Br. Opp'n Mot. Summ. J. 5–6.) The Bank obviously knew that it had participated, albeit on a secondary level, in underwriting the bonds. From this scant evidence SRI would have a jury make the leap that the Bank knew about WorldCom's accounting fraud, knew that WorldCom would default on the bonds, and knew that it was exposed on a securities claim in an unprecedented amount because it did not disclose the fraud. There is simply insufficient evidence to support a finding that Mr. Hance or anyone else at the Bank knew or even suspected that the Bank had a liability arising out of its underwriting activities for WorldCom in an amount of $250 million. There is absolutely no evidence that the Bank knew of WorldCom's accounting fraud which was the trigger for its collapse and the ensuing litigation. Without that knowledge, the Bank could not have known of a potential claim arising from the fraud.

{58}   The Bank is entitled to summary judgment on SRI's claims that it does not have liability based upon exclusions in the policy.

3.

DEFENSE TO COUNTS III AND IV:  UNREASONABLE SETTLEMENT AMOUNTS AND DEFENSE COSTS

COUNTERCLAIM COUNT IV:  INSUFFICIENT INFORMATION TO DETERMINE REASONABLENESS OF CLAIMS

{59}   As the Court has stated above, there has been significant discovery preceding the pending summary judgment motions.  *Supra*, ¶ 58.  SRI's contention that the settlement of the Bank's exposure in the underlying case was unreasonable is without merit.  The Bank sought approval at various times during the negotiations, and SRI declined.  The Bank arguably got the best settlement of any of the investment banking defendants and protected that advantage with a most favored nation provision.  Many investment banks that paid later paid more.  The Bank's exposure on a joint and several liability claim exceeded $17 billion.  Its settlement of $460 million in the face of that liability could not be said to be unreasonable.  Since it paid more than its combined coverage, it was by no means settling with the excess carriers' money.  Nor is there any merit to SRI's claim that it has never had sufficient information to determine the reasonableness of the claim.  It has had the benefit of enormous discovery and can still point to no facts which demonstrate unreasonableness.

4.

DEFENSE TO COUNTS III AND IV:  UNJUST ENRICHMENT

{60}   Permeating SRI's various defenses is an argument that the Bank has been or somehow will be unjustly enriched if it recovers on its liability insurance policies and that such potential of recovery is justification for relieving SRI of its obligations under the policies.  The Court finds SRI's position unpersuasive.  The Bank's claim is for money it lost, not money it had received and subsequently had to pay back.

{61}   First, SRI states in its brief that the Bank was repaid large loans out of the proceeds of the WorldCom bond offering.  (Def.'s Br. Opp'n Mot. Summ. J. 1–2.)

It cited no evidence to support that statement.[9]  Even if the Bank had been repaid some or all of its outstanding loans, there is nothing illegal about that repayment. At the heart of this theory is the premise that the Bank intentionally withheld information in the public offering with the understanding that the proceeds would be used to pay off its loans.  There is simply no evidence in the record to support the premise.

{62}  Second, SRI's argument that the Bank will be unjustly enriched if paid under the policy because its actions resulted in the avoidance of a loss on its underwriting activities would eviscerate the policies.  At the heart of most securities claims is the purchaser's assertion that it would not have purchased the security and incurred a loss in its value if the underwriter or issuer had not omitted or had not misrepresented material facts.  To hold that the underwriters were unjustly enriched because negligence allowed them to sell the bonds and not have to buy the bonds themselves would render the policies worthless.   The policies would be worthless because unjust enrichment would always be the case.  Additionally, in this case such argument ignores the fact that the bond offering for WorldCom was oversubscribed.  Since there is no evidence that anyone at the Bank was aware of the massive fraud ongoing at WorldCom, the only basis for liability is what the Bank should have known or found out in the due diligence process or what it failed to disclose that turned out to be material.  That negligence is exactly the circumstance for which the policy provided coverage.  There would be no unjust enrichment if the claims were paid.

{63}  SRI asserts the additional defenses of laches, estoppel, waiver, and unclean hands to Counts III and IV.  The Court finds these defenses are without merit and are summarily dismissed.

---

[9] SRI's Brief Opposing Plaintiffs Motion for Summary Judgment states that "[t]he Bank urged WorldCom to make a multi-billion dollar bond offering, which would enable WorldCom to pay down its debt." (Def.'s Br. Opp'n Mot. Summ. J. 1–2.)  The bond offering then allowed "WorldCom . . . to repay the Bank hundreds of millions of dollars in outstanding obligations." (Def.'s Br. Opp'n Mot. Summ. J. 2.)  In SRI's Statement of Facts, there are citations to support the former statement, but not the latter.  (Def.'s Br. Opp'n Mot. Summ. J. 5–8.)

## B.

## AMENDED COUNTERCLAIM COUNTS IX, X, AND IX: FRAUD AND MISREPRESENTATION BY THE BANK AND UNFAIR AND DECEPTIVE TRADE PRACTICES

{64} In considering the Bank's motion for summary judgment on SRI's claims for fraud, misrepresentation, unfair trade practices, and rescission, the Court must view all the facts in the light most favorable to SRI and draw all inferences in its favor. *Supra*, at III. If there are material facts in dispute, summary judgment is not appropriate. The Court finds that there are sharply disputed facts on issues that generally call for jury determination. At the heart of each of SRI's claims is the assertion of misconduct by the Bank's agent/broker Marsh and its employee Mr. Calder in connection with the procurement of the policies. SRI contends that when it signed the policy endorsements on March 1, 2002, it had been deceived and denied information material to its decision to remain on the policies without change. There exist disputes on at least the following facts in relation to that claim:

- The parties dispute the materiality of the ISA.
- There is a dispute over the materiality of Mr. Calder's misrepresentations to Limit to keep it on the policies. There is no dispute that Mr. Calder sent Limit a letter which contained a statement which he knew to be untrue in order to facilitate Limit staying on the policies. Was Mr. Calder's conduct in failing to reveal to SRI that he had met the condition that all carriers had to agree to remain on coverage through the use of a false latter a material misrepresentation?
- There is a dispute over what Mr. Calder said to SRI about the conditions surrounding the renegotiation of the excess policies after AISLIC withdrew from investment banking coverage.[10]

_____

[10] The problem faced by the Bank on these claims is that its agent, through Mr. Calder, admittedly misrepresented facts to another underwriter to get them to stay on the coverage. It is a fair inference that Mr. Calder would have done the same to SRI. Should the jury find, or the Court instruct them, that the standards of the London Market apply to Mr. Calder's behavior — something

- There is a dispute over whether SRI saw or could have seen the ISA before March 1, 2002.
- There is a dispute over the contents of Mr. Calder's "broke" to the excess carriers.[11]
- There is a dispute over which standards govern Mr. Calder's conduct: London Market standards which put a higher duty on the broker or U.S. standards which place more responsibility on the insurer.
- There is a dispute over what duties the London Market standards impose.
- There is a dispute over whether SRI could reasonably rely on Mr. Calder's statements under the circumstances and what the circumstances were.[12]
- There is a dispute over what SRI would have done if it had seen the ISA. Would it have declined to sign the endorsements or did it simply lose some additional premium it might have charged? [13]
- Whether or not SRI knew or should have known it had a right to renegotiate the terms of the excess policy is disputed.

---

the Court is increasingly inclined to do — the Bank's position becomes more tenuous. Certainly the Bank had every incentive not to lose the excess coverage since it already had large *Enron Litigation* claims. This would appear to be the weakest part of the Bank's case, and a reason for it to compromise.

[11] A "broke" is a sales pitch. (Def.'s Br. Opp'n Mot. Summ. J. 17.) Reference to the disagreement can be found in Section II. E. Disputed Facts.

[12] The Court notes that SRI renewed the excess policies in June 2002, 2003, and 2004 after notice of the *WorldCom Litigation* and *Enron Litigation* claims, thus casting some doubt that it would have opted out of coverage in March 2002 before it knew of the *WorldCom Litigation* claim. The record is not clear on what premiums were charged for 2002, 2003, and 2004, but that may also be a factor a jury would consider in determining both reasonable reliance and possible damages. SRI is a sophisticated insurer which renewed these policies. Reasonable reliance and damages were based on cancellation in March 2002 and would seem to be the weakest part of SRI's case, and a reason for it to compromise.

[13] SRI's position appears to be that it was denied material information that would have impacted the underwriting decision and that it is therefore entitled to rescission regardless of what its underwriting decision would have been had the information been provided. The record contains strong evidence that it would have continued coverage, perhaps at a higher premium. For that reason the Court is inclined to let the jury decide the question.

- What the Bank knew about WorldCom's financial situation and whether or not that provided an incentive to keep the excess policies in place is disputed.

- What SRI knew about WorldCom as one of the factors in determining the reasonableness of reliance is disputed. SRI insured WorldCom's officers and directors at the same time it insured the Bank.

{65} Where there are disputed facts impacting questions such as reasonable reliance and materiality, summary judgment is not appropriate. Nor is it clear what damages, if any, SRI would sustain on other claims if it were entitled to rescission. In addition, the questions of materiality and who knew what material information when prevents the Court from summarily applying the statute of limitations. Depending on what the evidence shows at trial, some issue may be submitted to the jury to clarify application of the statute.

C.

AMENDED COMPLAINT COUNT VI: BAD FAITH

{66} The Court now turns to SRI's motion for partial summary judgment on the plaintiffs' claim for bad faith refusal to pay the Bank's claim under the policies. While the Court has rejected many of SRI's arguments with respect to coverage, it has denied Plaintiffs' motion for summary judgment on SRI's claims involving misrepresentation. The Court finds that while the policy interpretation arguments of SRI are wrong, the arguments advanced for interpretation of language in the policies or for a change in the law do not rise to the level of "strained and fanciful." *See Olive v. Olive*, 76 N.C. App. 180, 189, 333 S.E.2d 41, 46 (1985) (noting that where the insurance company's reason for denying the claim was neither "strained nor fanciful" there was not tort of bad faith). The issue is not whether the policies covered investment banking activities; they clearly did. The issue is whether there was bad faith in denying the Bank's claim for the amounts it paid in settlement of the underlying securities class action in WorldCom. The Court finds there was not.

{67} Bad faith claims against an insurance company on the refusal to settle a claim require three elements. *Lovell v. Nationwide Mutual Ins. Co.*, 108 N.C. App.

416, 420, 424 S.E.2d 181, 184 (1993).  First, there must have been recognition of a valid claim and a refusal to pay that claim.  *Id.*  Second, there must have been bad faith in making that refusal, where "bad faith" means a refusal "not based on honest disagreement or innocent mistake."  *Id.* at 421, 424 S.E.2d at 185 (quoting *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 396, 331 S.E.2d 148, 155, *disc. rev. denied*, 314 N.C. 665, 336 S.E.2d 399 (1985)).  And third, to recover punitive damages for the tortious act of bad faith, there must have been aggravating or outrageous conduct on the part of the insurance company.  *Id.* at 420, 424 S.E.2d at 184.  Aggravating conduct can be shown through examples of "fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights."  *Id.* at 422, 424 S.E.2d at 185 (citing *Dailey*, 75 N.C. App. at 394, 331 S.E.2d at 154).

{68}  The appellate court has emphasized that the courts should approach bad faith claims with caution, stating:

> As our Supreme Court noted in *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 229 S.E.2d 297 (1976), exposing insurers to "liabilities beyond those called for in the insurance contract . . . except for the most extreme circumstances, would . . . be detrimental to the consuming public whose insurance premiums would surely be increased to cover them."  *Id.* at 116, 229 S.E.2d at 303.

*Olive*, 76 N.C. App. at 190, 333 S.E.2d at 46–47.  Identifying the elements, or lack thereof, of bad faith in the current case is not as simple as in the automobile accidents found in prior cases.  This is not a typical insurance coverage case where the claims giving rise to the liability are not complex or novel and there is a disparity in negotiating power between insured and insurer.  Two financial behemoths are battling over a large sum of money.[14]  The underlying litigation was complex and novel, the effects of which are still being felt.  The Court has a

---

[14] As far as the Court can determine, the parties have left no discovery undone and no plausible argument unasserted in the hundreds of pages of briefs that have been filed.  They have each proven to the other that they will not be intimidated.  It is time for rational business people who will undoubtedly do business with each other in the future to resolve their differences through negotiation.

mandate to tread cautiously and has done so when reviewing all three elements of bad faith even though an analysis of any one would dispose of the claim.

{69} Under the first element, there has not been a valid claim recognized by SRI. One factor is that for a period of time before this litigation there was a significant question of the Bank's liability in the underlying *WorldCom Litigation*. The other, and more influential factor, is that SRI never recognized a valid claim from the Bank.

{70} First, the circumstances giving rise to the Bank's claim were unprecedented. The claims arose from the two largest corporate fraud and bankruptcy cases in United States history. Millions of employees and investors lost billions of dollars. New theories of liability were generated by their underlying cases against investment banks and others in an effort to recover their losses. The losses involved in Enron and WorldCom were extraordinary by any measure. The Bank's claims were not isolated — they were but one of many similar claims made by investment banks against their insurers under liability policies. The underlying claims were complex, novel, and hotly contested. The investment banks, not the insurers, controlled the underlying litigation because the claims, particularly the novel joint and several liability claims, exceeded most policy limits. In fact, the Bank's claim was settled for an amount far in excess of the coverage provided by all of its policies. Substantial deductibles were also involved. The timing of the Enron and WorldCom claims resulted in the Enron claims, which came first, using most, if not all, of the deductibles.

{71} The entire scenario was complicated by varying degrees of exposure and differing levels of knowledge about WorldCom on the part of the underwriters. The Bank was not one of the lead underwriters on the second bond offering, but it did have significant knowledge of WorldCom as a result of its loans to WorldCom and its CEO and the fact that it had also participated in the first bond offering. Different insurers provided different kinds of coverage. Differing levels of underwriting responsibility existed. The lead underwriters paid several billion dollars more than the Bank to settle their claims. The sheer magnitude of the

Enron and WorldCom cases coming in close sequence, combined with the myriad complexities guaranteed a careful and studied approach by any insurer. Many insurers had coverage for many of the investment banks involved. The investment banks themselves originally presented a united front in contesting many of the new and old theories of liability in the underlying cases.

{72} The Bank denied liability in the securities class action as did all other investment banks. The Bank did not change its position until after summary judgment motions by the investment banks had been denied by Judge Cote.[15] *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004). Her decision formed the basis of the potential liability of the WorldCom bond underwriters. Until that decision the basis of any liability of the underwriters was uncertain, hence coverage could not be determined until at least that date. Even then the ultimate basis of liability could not be determined. The magnitude of the corporate wrongdoing has resulted in new theories of liability being asserted such as the Section 11 claims and "scheme liability"— a topic currently before the United States Supreme Court. *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 443 F.3d 987 (8th Cir. 2006) *cert. granted*, 127 S. Ct. 1873 (2007) (oral arguments were scheduled for October 9, 2007). Differing liability theories could result in different outcomes on coverage issues. In short, the circumstances surrounding the Bank's claim were unusual, unprecedented, and complex, and created numerous coverage questions not easily resolved.

{73} Even with the complexity of the underlying litigation, SRI might have recognized some kind of valid claim. However, it has argued that it never recognized that the Bank had a valid claim and that such recognition is a prerequisite to a bad faith claim. *Lovell*, 108 N.C. App. at 420, 424 S.E.2d at 184 (stating the insurance company must have "recognized a valid claim" to recover

---

[15] Judge Cote granted in part the underwriters' motion for summary judgment in regards to omissions in the registration statements. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d at 685–697. Judge Cote denied the underwriters' motion for summary judgment in regards to their liability for the financial statements. *Id.* at 661–685. The underwriters argued that there was "no dispute that they acted reasonably." *Id.* at 661. Judge Cote disagreed. *Id.* at 683.

punitive damages under bad faith). It is clear that SRI never told the Bank that it recognized its claim as valid and that it consistently told the Bank that it had questions and reservations about the claim and coverage. If the recognition of a valid claim is a prerequisite to a bad faith claim — and the language in the appellate court cases seems to say it is — then the Bank has not established a necessary prerequisite to its bad faith claim. The Bank argues that SRI de facto recognized the validity of the claim by paying other claims. As the Court pointed out above, there were compromises and differences in the other claims which would prevent such an easy assumption. As the Court of Appeals pointed out when upholding summary judgment on a bad faith claim in the *Olive* decision, "[i]t appears that defendant here promptly and consistently denied plaintiffs' insurance claim based on an interpretation that is neither strained nor fanciful, regardless of whether it is correct." *Olive*, 76 N.C. App. at 189, 333 S.E.2d at 46.

{74} The second element, the presence of "bad faith," is also lacking. The Bank points to several facts as being indicative of SRI's bad faith: SRI filed first in New York, SRI settled other claims that appear superficially to be similar to the claim at issue, and other carriers settled the Bank's claims on this matter. The Bank also argues that SRI's defense of its position on the validity of the Bank's claims was strained and fanciful and that SRI's additional defense of rescission is further evidence of bad faith. The Court does not find that any of these are evidence of bad faith.

{75} These are two large corporations jousting over large sums of money. That both employed coverage counsel and sought to select the venue for their disputes is unsurprising and does not give rise to any bad faith claim. The Bank has simply not been disadvantaged by SRI's attempt to secure venue in New York. The day after the Bank reached its settlement of the underlying claim, and the same day the settlement was announced, SRI filed a summons with notice in the Commercial Court in New York City.[16] There is no evidence in the record that it knew the Bank had settled when it did. SRI communicated a willingness to continue discussions on

---

[16] SRI was joined by the Lloyd's Syndicates, the policy holder for the first level of excess policies.

the same day. Other investment banks, including banks insured by SRI, had not settled. There had not been any significant settlements of WorldCom claims between insurers and insureds at that point in time either. Many of those banks were located in New York, and there was a good possibility that New York law would be applied to those policies written in New York. The Bank quickly filed its declaratory judgment action in North Carolina. It did not contain a bad faith claim for obvious reasons. No claim had been submitted at that point, and settlement had just been reached in the underlying action. The policies are indemnity policies, and no actual payment had been made at that point. The New York action was stayed in favor of the North Carolina action, so the Bank was not denied its forum of choice. The Bank first tendered a claim to SRI for the WorldCom settlement on September 28, 2005. By this time, the Bank had already filed its Amended Complaint asserting a bad faith claim. No claim has been tendered for Enron, as the amounts involved there were below the deductible and first layer of coverage.

{76} Sometime after this litigation began, the various claims of investment banks against their insurers were negotiated to settlement. The Bank ultimately settled with all its excess carriers with the exception of SRI. Settlement occurred on August 11, 2005, between the filings of the Complaint on March 23, 2005, and the Amended Complaint (which included the bad faith claim for the first time) on August 31, 2005. On the whole, these settlements were not for the face value of the policies, but were compromises which reflected some uncertainty of coverage, which was disavowed in all the settlements. The settlements, while reflecting a discount for uncertainty, also were an indication that it was more likely than not that coverage existed. SRI has settled claims of other investment banks arising out of the WorldCom securities class action. Those settlements mirrored the level of uncertainty surrounding the other settlements. While all the settlement information is interesting, the Court does not find it probative of the issue of bad faith in this case. The settlements were compromises. The policies written by different insurers contained different terms and covered different insureds who had varying levels of involvement with the underwriting and with WorldCom. The

circumstances of some of the other excess carriers differed from SRI's position because they had been carriers on prior policies and had knowledge of the history of the prior claims that SRI did not have. The Bank's substantial business with Mr. Ebbers and WorldCom put it in a different position from some of the other underwriters. It is simply not possible to find sufficient similarities in all the various circumstances to warrant a conclusion that SRI was engaged in bad faith because it did not pay the Bank on either the same basis it paid other claims or on the same basis that other carriers settled with their insureds under different policies. The other settlements simply do not provide support for either side's argument on the bad faith claim. Courts should not put themselves in the position of trying to decide what a proper compromised settlement should be based on the settlements in other situations. The Bank has sued for the entire amount of its coverage, and the Court can neither create a compromised settlement for it nor hold that SRI should have compromised at a certain amount.

{77} The Court does not find SRI's position that Section 11 claims are excluded from loss to be "strained and fanciful" even though it has squarely rejected the argument. There are two reasons. First, it is clear that there may be some circumstances in which a court would find such claims to be excluded and those would depend on the level of culpability of the insured. Second, the law in the area of securities class actions is evolving and uncertain. The very fact that the *Stoneridge Investment Partners* case is pending before the U.S. Supreme Court on scheme liability is indicative of the uncertainty of the nature of the claims in this area. The actions of an insured can give rise to different kinds of liability, and SRI was entitled to raise the defense even though it lost. Certainly, the Bank had a relationship with WorldCom that placed it in a precarious position and warranted its settlement of the underlying class action. SRI was entitled to learn about that involvement before deciding whether to pay the claim. Accordingly, there existed some reasonable dispute over interpretation of the terms of the policy. The fact that the Bank has prevailed on that issue is not a basis for bad faith.

{78} SRI added the additional defense of misrepresentation after discovery in this action, which defense was peculiar to the Bank's claim and not found with other insurers. For reasons set forth above, the Court has concluded that there are issues of fact to be determined by a jury with respect to SRI's rescission claim. Again those issues may well be resolved against the insurer, but there are legitimate issues with respect to the actions of the Bank's agent in procuring the policies, and the facts are in dispute. The importance of the Court's denial of the Bank's motion for summary judgment on those issues is unclear. In the *Olive* case, Judge Eagles emphasized that the trial court's denial of plaintiff's summary judgment motion did not serve as the basis for the court's decision on bad faith. He said: "Lest we be misunderstood, we emphasize again that the trial court's determination of plaintiffs' summary judgment motion on the first claim did not influence our determination of the propriety of its rulings on the second and third claims." *Id.* at 190, 333 S.E.2d at 47.

{79} The third element of bad faith, aggravating circumstances, is also lacking. The Court finds insufficient evidence of aggravating circumstances on the part of SRI in this record. SRI's denial of the claim has been consistent. The Bank has not been misled in that regard. SRI cooperated when the Bank wanted to settle by waiving any claim that SRI's consent was required, thus permitting the Bank to proceed with settlement. (Def.'s Br. Supp. Mot. Partial Summ. J. 6.) The Bank did so for its own reasons and despite the fact that most, if not all, of its excess carriers had thus far refused to pay under the policies. The Bank's effort to portray SRI's creation of a special unit to handle the securities claims arising out of the Enron and WorldCom scandals as evidence of bad faith is unpersuasive. SRI and other carriers were facing billions of dollars in potential claims. The fact that a special unit would be created to coordinate the massive claims is unremarkable. It would be remarkable if the insurers had not created mechanisms to deal with a multitude of large claims from various insureds. "Reassessing losses" and "resisting opportunistic and unfounded demands" are not bad faith. (Pls.' Br. Opp'n Mot. Partial Summ. J. 7.) Nor does the Court find the Bank's description of Mr. Murray's

style as "disruptive" and "combative" sufficient evidence of bad faith. (Pls.' Br. Opp'n Mot. Partial Summ. J. 14.) He was entitled to ask questions about how the Bank was defending itself and what its strategy was going to be and why. The Bank was not required to follow any of his suggestions and in fact rejected them out of hand. (Pls.' Br. Opp'n Mot. Partial Summ. J. 14–16.)

{80} The Bank has failed to establish a viable bad faith claim, and SRI's Motion for Partial Summary Judgment is GRANTED as to the bad faith claim.

VI.

CONCLUSION

{81} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1. Plaintiffs' Motion for Summary Judgment as to Count III of the Amended Complaint is GRANTED, subject to determination of the rescission claim.

2. Plaintiffs' Motion for Summary Judgment as to Count IV of the Amended Complaint is GRANTED, subject to determination of the rescission claim.

3. Plaintiffs' Motion for Summary Judgment as to Count I of the Counterclaim is GRANTED.

4. Plaintiffs' Motion for Summary Judgment as to Count II of the Counterclaim is GRANTED.

5. Plaintiffs' Motion for Summary Judgment as to Count III of the Counterclaim is GRANTED.

6. Plaintiffs' Motion for Summary Judgment as to Count IX of the Amended Counterclaim is DENIED.

7. Plaintiffs' Motion for Summary Judgment as to Count X of the Amended Counterclaim is DENIED.

8. Plaintiffs' Motion for Summary Judgment as to Count XI of the Amended Counterclaim is DENIED.

9. Defendant's Motion for Summary Judgment as to Count VI of the Amended Complaint is GRANTED.

10. Plaintiffs' Motion in Limine is GRANTED.

This the 19th day of December, 2007.